# GEORGE P. THISTLE and others, *vs.* THE FROST-BURG COAL COMPANY.

It is not within the scope of legislative power to give to a law the effect of taking from one man his property and giving it to another, by any new rule of tenure *retroactive* in its character.

Previous to the act of 1852, ch. 177, *actual enclosure* for twenty years was essential to the possession of land by a *tort feasor*, in order to divest the title of the owner, and the legislature had no power to change this rule of law by the 2nd section of that act, so far as to give it a *retroactive operation.*

Thistle, *et al.*, *vs.* The Frostburg Coal Co.

But the legislature has power to alter and remodel the *rules of evidence* and *remedies* to which parties claiming title and possession of land may resort.

A law which merely declares, that the evidence which would be sufficient to support a claim to title to land *in equity* shall be available for the same purpose *at law*, is constitutional.

Possession is a question of law to be determined by the court, upon the facts of the case, and where this is the point at issue in the suit, the mere statement of a witness, that he *took possession* of the land, without stating the *acts* by which he did so, is not admissible evidence.

The act of 1852, ch. 177, sec. 2, is in contravention of the common law, and this court is not disposed to give it a very *liberal* construction.

Possession claimed under this act, must be proved with clearness and precision, must cover the full period of twenty years, and must be adverse, exclusive, and unbroken.

The *acts of user and ownership*, relied on, must be such as comport with the character of the claim or title of one asserting ownership against *all the world*, and not such as may be done with impunity by any and all persons in common with him who claims to be the real owner.

Giving permission to cut wood upon a rough, mountainous, uncleared wood lot, in a region where it was usual for any one who wanted a stick of timber, to go upon any man's land and cut it, is not such an act of exclusive ownership as is contemplated by the law of 1852, ch. 177.

Neither is the mere *assertion* of a claim to the land such an *act of user and ownership* as comes within this statute.

Offering to sell the land, going upon it and walking over it, locking up the house and taking the key away, it being a matter of dispute whether the house was upon the lot claimed or not, are not sufficient to show such possession as is contemplated by this act.

A prayer that there "is no evidence to show a title by possession," where there is some evidence upon the point, is *too general*.

APPEAL from the Circuit Court for Allegany county.

*Ejectment* by the appellants against the appellee, for a tract of land in Allegany county, being lot No. 3,978, one of the military lots westward of Fort Cumberland. Plea, *non cul.*

*Exception.* The plaintiffs offered in evidence the patent for the lot, the will of the patentee, Murdock, devising it to his wife, in fee, and a conveyance from her, dated the 10th of May 1830, to George Thistle, who died intestate in 1847, leaving the plaintiffs, his children and heirs at law.

The defendant then proved, by *Moses Rawlings*, that he was sheriff of Allegany county in the years 1831, 1832 and

1833, and had many executions against George Thistle, who was, besides, indebted to witness on private account; that Thistle, in one of these years, gave to witness the lot in question, together with the adjoining lot, No. 3,980, as payment of the debt so due the witness, which the latter agreed to receive in satisfaction thereof, Thistle saying, at the time, it was all he had, that the lots were not worth much, but would be worth something to witness thereafter; that witness took possession of the two lots and held them up to the time he sold them to Armstrong; that witness put a man by the name of Klink in the house on lot No. 3,980 as his tenant, and told him to take care of these lots, and to look after them, and that he put the lots in charge of Klink, as his tenant; he put Klink so in possession in 1835, which was the first time he ever put any person there to live on the lots; that Thistle never afterwards claimed these lots; that they lie about one mile and a half from Frostburg, and were generally known in the neighborhood of Frostburg, where witness went to live in 1835, as witness' lots. On cross-examination the witness stated, that the contract between himself and Thistle was wholly verbal; that the lot in question is all in wood, no part of it being enclosed; that there is no clearing on it, nor house nor improvement of any kind, nor has any part of it been cleared or enclosed at any time.

The defendant then offered in evidence a deed for both these lots from Moses Rawlings to James D. Armstrong, dated the 29th of March 1850, and regular conveyances of the lot in question from Armstrong to Frost, and from the latter to the defendant.

The defendant then proved, by *Francis Hammers*, that the stumps pointed out by the witness on the plats, are stumps of trees cut by him on this lot twenty-one or twenty-two years ago; that he was making bread-trays and other things, and asked Rawlings' permission to get timber off of this lot, and he gave it to him; that he cut timber there from time to time, at intervals of two or three months, under this permission from Rawlings, up to the time Armstrong bought; that the lot was known as Rawlings' lot; witness thinks that Rawlings lived in

Frostburg at the time he so gave permission; that after he heard Armstrong had bought the lot, he cut timber on it under a permission from him; that this was more than ten years ago, and that he cut it under Armstrong up to the time the latter sold it to Frost. On cross-examination the witness stated, that the lot is all in timber, no improvements of any kind upon it, and that the hunters have been in the habit of cutting on the land.

*Robert McCulloh*, who was deputy sheriff under Rawlings, proved, that in 1832 he wanted to get the privilege of cutting timber for bark on this lot; that Rawlings gave him the privilege, though he cut no trees, but spoke to some of the Winebrenners to peel bark on it; that the lots were then known in the neighborhood as Rawlings' lots; thinks that he gave Armstrong the first information he had that these lots belonged to Rawlings.

*Moses Rawlings*, being recalled, proved, that he did not rent both lots to Klink, but put them both in his charge; that is, did not charge him rent for the wood lots.

*Wm. S. Winebrenner*, a witness for the plaintiffs, proved, that he was born on the adjoining lot, No. 3,980, in August 1825, and has lived in the neighborhood of this lot for thirty-one years, and now lives within a mile and three-quarters of it; that ever since he can recollect, they were said to be Thistle's lots; that it was usual about there, if a man wanted a stick of timber, to go upon any man's land and cut it, it was the custom so to do; that he heard it said Rawlings had one lot there, which was No. 3,980, but never heard of his owning this lot. On cross-examination this witness stated, that about sixteen years ago, he heard people say that one lot was Rawlings'; witness heard his grandfather say so; that he knows of no cutting done on the lot by any one except Hammers, and some rail timber cut on it by Frost, seven or eight years ago, since he purchased.

*Isaac Winebrenner* proved, that he wanted to live on lot No. 3,980 about thirty-two years ago; that the lot now in controversy was always called Thistle's lot; that it had been previously called Murdock's lot; that it was said, in 1835, that

Rawlings had one lot there, but that was the Hammer's lot, not this.

The plaintiffs then offered the tax books of Allegany county, to show that the lot in question has, from 1832 to the present time, been taxed to Thistle and his heirs.

*Moses Rawlings*, again recalled for the defendant, proved, that when Thistle sold him the lots, he told him to go and take possession of them; that he had conversations with Thistle, he is certain of two such about 1840, in relation to the lots alluded to, when he asked witness whether he had disposed of the lots, or had made any thing out of them? to which witness answered that he had not. Upon cross-examination he said, that the manner in which he took possession of the lots when Thistle sold them to him, was, that he offered to sell them to McCulloh; that there was no actual possession given to him by Thistle, except as he has already stated; that he went upon the lots immediately after Thistle sold them to him, to look at them; walked over them, went into the house, locked up the door, and took the key away with him; that this was about the manner in which he got possession of them; that he was there several times before he put Klink in the house, looking at the property; that he cannot remember the amount of Thistle's indebtedness to him; that Thistle owed him more than $100, for which he took the lots, and took them in payment of what Thistle owed him; that he has no memorandum of the account or settlement between himself and Thistle; that during the whole time referred to, Thistle lived about one mile south of Cumberland, and about thirteen miles from the lots; that Thistle was about seventy-eight years old when he died, and thinks he did not move about much for some years before his death, but at the time of the sale of the lots, he was an active man.

*Morris Winebrenner*, for the plaintiffs, proved that Robinson lived in the house on lot No. 3,980 in 1835; that Klink came there to live in 1836 or 1837, thinks in the former year, it was certainly after the fall of 1835; that Robinson paid rent for the house to witness' father; that Klink paid rent to his father for the house and part of the ground in 1836 and after-

wards.  Upon cross-examination, he said that his father never claimed lot No. 3,980, but claimed the house as his property, and claimed it as situated on a tract of land called "Hillside," adjoining this lot; that the tenants farmed a cornfield on this lot, but his father never charged them rent for it; that the house was in possession of Klink, as his father's tenant, after 1836, and paid rent to him for it; that after Klink left it, his father rented the house to one Stot, and received rent for it from him; that the house was built by his father, brother and Fouch, who were in possession of it as his father's tenants, but did not clear all the ground as such tenants, as his father did not claim any part of the land east of about one rod from the house, where he claimed that the lines of "Hillside" ran; that his father never claimed further than this line, and the tenants who cleared over the line did so themselves, and not by his father's permission; that he was one of the chain-bearers on this survey, and when they run out lot No. 3,980, he was disappointed to find that its lines did embrace the house and spring; that in a chancery suit now pending, he and his brothers are claiming this land to the west of the house as part of "Hillside," and should they sustain that suit they will get more land and more money.

*Wm. S. Winebrenner*, recalled for the plaintiffs, proved that after Klink left the house, Stot went into it under his grandfather.  On cross-examination he said, that he thinks he was eighteen or twenty years old when Stot went there; that Stot is now dead; that his grandfather died in 1847 or 1848; that if he had his account with him, could tell the day when Stot went there, can't say it was before 1840, it might have been in 1836 or 1837, it may have been as late as 1845.

The plaintiffs then prayed the court to instruct the jury that there is no evidence in this case to show a title by possession in the defendant.   This direction the court (PERRY, J.) refused to give, but was of opinion, and so instructed the jury, "that if the defendant and those under whom it claims, have held the said land by adverse possession for more than twenty years prior to the bringing of this suit, then such adverse possession, under the act of 1852, ch. 177, may be shown by *sparsim*

cutting from time to time on said land by the defendant and those under whom it claims, with claim of title or right to said land, by putting the land in charge of persons to take care of it and keep off intruders and trespassers, by putting tenants on the land, and such other acts of ownership as are usually exercised over uncultivated wood land."

The plaintiffs excepted to the refusal of the court to grant their prayer, and also to the opinion and direction so given by the court to the jury. The verdict and judgment were in favor of the defendant, and the plaintiffs appealed.

The cause was argued before LE GRAND, C. J., TUCK and MASON, J.

*Henry Bruce* for the appellants, argued:

1st. That the act of 1852, ch. 177, sec. 2, alters the law, as it previously stood, only in *one particular*, and the proof in the case does not make out a case of possession under that act. The defendant claims solely by *possession*, and before the passage of this act, no such title could be set up without *actual enclosure*. 1 *Gill*, 500, *Casey vs. Inloes*. 5 *Md. Rep.*, 256, *Armstrong vs. Risteau*. *Ibid.*, 237, *Hoye vs. Swan*. Under these decisions the possession of a *tort feasor* must be by *actual* enclosure, adverse, continuous, and under claim of title. Not one of these requisites has been complied with in this case. Apart, then, from this act of 1852, it is clear this case never would have arisen. This law says, "*actual enclosure* shall not be necessary to prove possession, but *acts* of *user* and *ownership*, other than enclosure, may be given in evidence to prove possession." This only dispenses with *actual enclosure* as proof of possession; it still requires "*acts* of *user* and *ownership*" over the land. Now what proof is there of such acts in this case? The statement of Rawlings, that *he took possession*, of course shows no such *acts*. The only proof of the *manner* of taking possession, is that he *went once or twice* upon the land, *walked over it*, and *looked at it*, and gave permission to Hammers to *cut timber* upon it for *bread-trays*, which the latter did. But it must be remembered that it was a wild, moun-

tainous, uncleared wood lot, with no improvements whatever upon it, and that it was proved to be the *usual custom* in that region for *any one* who wanted timber, to go upon *any man's* land to cut. Granting *permission* to *Hammers* to cut timber on this lot, and the actual cutting under such permission, cannot, therefore, be regarded as *acts of user* such as the law requires. The house, which it is proved that Rawlings locked and took the key away with him, was not *upon this lot,* and this act, therefore, cannot help the case. Apart from these, the record shows no proof of *acts* of *user* and *ownership*, except putting Klink in the house as tenant, which will be considered hereafter. It is submitted they do not amount to such proof as the *law requires.*

2nd. That the act of 1852, so far as it *retroacts,* is *unconstitutional* and *void.* The effect sought to be given to it in this case, is to take away one man's property without his consent, and give it to another. There is no power in the legislature to do this. 9 *G. & J.,* 409, *Regents, &c., vs. Williams.* 2 *Gallison,* 139, *Society, &c., vs. Wheeler.* 7 *Johns.,* 493, 500, 505, *Dash vs. Van Kleeck.* 8 *Wend.,* 661. *Sayre vs. Wisner.* *R. M. Charlton's Rep.,* 332, *Forsyth vs. Marbury.* 1 *Harrington,* 81, *Jones vs. Wootten.* 2 *Pet.,* 657, 658, *Wilkinson vs. Leland.* 2 *Greenlf's Rep.,* 288, *Proprietors, &c., vs. Laboree.* 4 *Wheat.,* 209, *McMillan vs. McNeill.* 8 *Mass.,* 430, *Call vs. Hagger.* 8 *Rep.,* 118, *Bonhom's case.*

3rd. That the length of time of the possession proved, was too short. The first act of possession properly to be considered, was not till 1835, when he put Klink into the house and on the land *as tenant.* This does not make out the *twenty years.*

*George A. Pearre* and *Thos. J. McKaig* for the appellee, argued:

1st. That the defendant here does not occupy the position of a *tort-feasor.* There is an important distinction between a possession taken by a *wrong-doer* and one taken by a person *under title.* It is immaterial whether the title be *valid* or *not,* provided the *entry* and *claim* be *bona fide* under that title. It

is the *intent* of the *entry* which gives *character to the case.* A party so entering has *constructive possession* to the *extent* of his title, whilst a mere *tort-feasor* is confined to what he has *grasped* by *actual enclosure.* 5 *Md. Rep.*, 248, *Hoye vs. Swan.* 1 *Gill,* 500, *Casey vs. Inloes.* Now we claim in this case under a *parol executed contract of sale,* and took possession under it, and insist, therefore, that we are entitled to all the presumptions of the law in favor of a party entering under *claim of title* or *color of right.* What is the meaning of *color of title?* or *colorable title?* In *Smith vs. Stewart,* 6 *Johns.*, 49, it is said, that an entry *"under a contract for a deed"* is an entry under *"color of title,"* which might be enforced in a court of equity. In *M'Call vs. Neely,* 3 *Watts,* 72, it is said, by *C. J. Gibson,* that *"to give color of title* there need not be a *written conveyance,"* that *"*an entry is by color of title when it is made under a *bona fide* and not pretended claim to a title existing in another." And in that case a *bona fide* claimant under a *parol purchase* of a *warrant* was held to be in *under color of title.* In *Sumner vs. Stevens,* 6 *Metcalf,* 338, it was held, by *C. J. Shaw,* that a party in *"under a parol gift"* entered *"under color of title,"* and that his possession was *adverse.* In 2 *Metcalf,* 32, *Barker vs. Salmon,* the same was held of an entry under a *parol executed contract of sale.* In 2 *Hill, ( S. C. Rep.,)* 488, *Sumner vs. Murphy,* it was held, that a party in under a *parol* gift was in under *color of title,* and that his title was good to the *extent* of the *boundaries* of the *land intended* to be given. The ground of these decisions is, that such an entry and possession under it for twenty years *takes* away the *right of entry* of the *owner.* The plaintiff in ejectment must have *a right of entry* as well as the legal title, and to show that he wants *either* protects the defendant. 4 *Md. Rep.*, 173, *Hammond vs. Inloes.* Now in this case Rawlings, under whom we claim, *purchased* the land from Thistle under a *parol contract.* Thistle *delivered possession* thereof, and Rawlings *took possession* of it under this contract, by going upon the land, permitting timber to *be cut from it,* going into the house upon one of the lots, which was then vacant, *locking it up and taking the key away with him,*

18      v.10

thus keeping every *one else out*, and afterwards putting a *tenant* into it with charge to take care of the land.   We, therefore, insist that his *possession* was *adverse* under *color of title*, *notorious* certainly as to him who delivered the possession, and also *continuous*, for where a relation is once shown to have existed and to have commenced in right, it is presumed to continue.   As to the acts of ownership they must of necessity be *comparative*.   This was a wood-lot in a mountainous region, and what sort of acts of ownership over it are necessary? "Where the nature and position of the property, and the mode of using it, are such as to afford manifest evidence to all persons of an intent to claim the land by adversary possession," actual enclosure is not necessary even in the case of a *tortfeasor.*   5 *Md. Rep.*, 274, *Armstrong vs. Risteau.*   11 *Pet.*, 41, *Ewing vs. Burnet.*   It all depends upon the *character* of the property.

2nd.  But admit that the principle of *actual enclosure* would apply to this case but for the act of 1852, ch. 177, we say that this act dispenses with *such proof* of possession, and that it is *constitutional*.   In *Warner vs. Hardy*, 6 *Md. Rep.*, 539, this court has said: "Whatever the law was before the act of 1852, ch. 177, sec. 2, it is certain that *since its passage* it is not necessary to prove possession by enclosures," thus recognising the validity and *constitutionality* of the act, and that too in reference to a case like the present, where it must necessarily *retroact*   But, independently of this decision, there can be no difficulty in sustaining the constitutionality of the law.   It merely changes the *evidence* and does not divest any vested right: so far as this case is concerned it operates to *quiet possession;* it *confirms* the contract *of sale* by Thistle to Rawlings. The Legislature have certainly the power to say that a *parol, executed sale* shall *bar an ejectment;* that a *title* good *in equity* shall be good *at law*.   It does no more than validate an *equitable title*, and in this respect is like the thousand acts in our statute books *validating defective deeds*.   It was statute law that made all our titles to be in writing, and statute law can change them.   We have a vested right as well as the appellants; they say they have a vested right to recover; we say

## DECEMBER TERM, 1856.                139

Thistle, et al., vs. The Frostburg Coal Co.

we have a vested right in the contract. It is certainly in the power of the Legislature to change an *equitable* to a *legal* remedy; for no man has a *vested right* to any *particular remedy*. These positions are fully sustained by the following authorities: 2 *Ala. Rep.*, 401, *Bartlett & Waring, vs. Lang.* 9 *Gill*, 304, *Baugher vs. Nelson.* 2 *Pet.*, 380, *Slatterlee vs. Matthewson.* 6 *Pick.*, 508, *Springfield vs. Hampden Commissioners.* 23 *Maine Rep.*, 318, *Read vs. Frankfort Bank.* 12 *Geo. Rep.*, 437, *Searcy vs. Stubbs.* 18 *Maine Rep.*, 109, *Oriental Bank vs. Freese.* 14 *Do.*, 344, *Beal vs. Nason.* 17 *Sergt. & Rawle*, 64, *Bleakney, et al., vs. Farmers & Mechanics Bank.* There can be no doubt that the evidence of possession under this act was sufficient. As early as 1832 Rawlings gave permission to McCulloh to cut bark. He took immediate possession of the land; went into the house on one of the lots, locked it up, took the key away with him; was on the property several times before Klink was put in. Thistle when he sold to him told him to go and take possession of the lots, and he did. As late as 1840 Thistle acknowledged Rawling's title, and never claimed the lots after the sale.

3rd. That the prayer of the plaintiff was *too general* under the act of 1825, ch. 117; it should have pointed out the *particulars* in which the evidence was defective. 6 *Md. Rep.*, 407, *Hatton vs. McClish.*

*William Price* for the appellants, in reply:

The act of 1852, whatever may have been the intention of the Legislature, will not be permitted to retroact upon vested rights. There is no power under our institutions to take one man's property from him and give it to another. That such would be the effect of the act, if the court gives it a retrospective operation, is very plain. At the time of its passage actual enclosure was necessary to vest in a party entering, without claim of title, a right by possession. This resulted from the nature of the conditions which the law annexed to the acquisition of title by mere occupancy. These conditions were that the possession should be open, notorious, continuous and exclusive, amounting to an ouster of the rightful owner, and

warranting the presumption of a grant from the owner to the defeasor. The legal theory upon which the presumption of a deed rests is this, that the owner would not permit a mere *tort-feasor* to take open possession of his land and hold it for twenty years, and that the acquiescence of the owner could not be accounted for but upon the supposition of a grant. But it is obvious that to warrant the supposition of a deed, the facts of the case must be such as to leave no doubt of the knowledge of the owner that there was an occupancy of his land by a person claiming title to it.

Now an *enclosure* was an invasion of his rights, of which the owner ordinarily could not but be aware. He could *see* an enclosure. It had a marked commencement as to time, a fixed locality as to space and limits. The rule was, that a party entering upon land without claim of title, should be confined to what he had grasped, and that the only evidence of what he had grasped, which they would listen to, was *actual enclosure*. But there was another class of cases which the courts regarded as entitled to more favor; it was that of persons entering upon land under claim or color of title. A party thus occupying land was, as against the rightful owner, still a trespasser, but a trespasser of a mitigated character, and to him was conceded a *constructive* possession to the extent of his colorable title. What then is a claim or color of title? or colorable title? An eminent judge, (*Gibson, C. J., 3 Watts*, 72,) complains that the term is vague and of uncertain import, and has never been defined. But is the complaint just? *Mellen, C. J.*, 2 *Greenlf's Rep.*, 288, and *Parsons, C. J.*, 4 *Mass.*, 416, both define a claim of title to be a deed duly registered or other title of record. Being of record it is notice to all the world of the character, extent and limits of the claim. And this definition is sound and sensible, and with good reason invests the party having actual and notorious possession of part, with constructive possession of the whole to the extent of his supposed title; for the deed enrolled is good as a claim of title, in the legal acceptation of the term, whether the title it conveys turn out afterward to be a good title or not.

In principle a deed enrolled is the equivalent of the livery

of seisin under the common law. In many of the States it has been substituted for it. It has been certainly so substituted in Maryland. 1 *Md. Rep.*, 39, *Key's Lessee vs. Davis.* The livery of seisin under the old common law was made in the presence of the vicinage, by a public delivery to the feoffee of a twig or a clod in the name of the whole. It invested the feoffee with the seisin, and the seisin was the consummation of the feudal investiture, by which the tenant was admitted into the feud, attended upon the lord's courts and performed the rites of homage and fealty. Disseisin, in fact, was a violent termination of this seisin. It was a wrongful, public and notorious act, by which the defeasor put himself in the place of the defeasee, and being then regarded as the tenant in fact of this freehold, made his appearance at the courts of the lord and performed the services, as well as the rites of homage and fealty. For whether this or that individual were the tenant of the freehold, was a matter about which the lord gave himself but little concern, it being altogether sufficient for him that there was some one in possession to perform the services. The party therefore who was in by wrong was recognised as the tenant, in preference to the rightful owner who was unfortunately out of possession. Hence the disseisor could transfer the freehold by livery to a stranger, who became in turn the tenant against all the world, until the rightful owner recovered by action the possession of the premises.

Now the subject of the seisin and the disseisin of which I have been speaking was the entire feud—the whole property. The feudal services, the homage and fealty, the attendance upon the courts of the lord, were all rendered in return for the whole feud. When, therefore, it is said that the deed enrolled of our day is the substitute for the livery of seisin of the common law, it must place the party entering under color of title in constructive possession of the whole tract or it is no substitute, unless by the description of the property contained in the deed he limits his possession to narrower bounds.

Thus stood the law. A party entering under a claim of title, acquired a constructive possession to the extent of his supposed title. He did not need an enclosure to help out his

constructive possession.   But a mere intruder who entered without pretence of title was confined to what he had grasped by actual enclosure.   Then came the act of 1852, which provides, that "actual enclosure shall not be necessary to prove possession, but acts of user and ownership other than enclosure may be given in evidence to the jury to prove possession." Very curt, very comprehensive.   A provision of just three lines thrust into the middle of a statute, of the design of which provision neither the title, nor the general provisions of the bill, give us any notice whatever.   By the title we are informed that it is "an act for amending proceedings in actions at law," and in one of its sections is wrapped up a provision which, in few words, revolutionizes an important branch of the ejectment law of Maryland.

And now what is to be the effect of it?   Upon the case of a party entering under claim of title it can have no effect—such party having a constructive possession to the extent of his supposed title, is not confined to his actual enclosures.   Its whole operation must be limited to the case of the *tort-feasor*, the intruder, the trespasser.   And what is to be the effect of it upon the class of cases to which it can alone apply?   Shall this provision be permitted to go back for twenty years, disseize one class of persons of their freeholds, and vest those very freeholds in another class of persons, who, up to the moment of its passage, had neither title, nor pretense of title, to them? What is to be the effect of it in this case?   George Thistle died in 1847, seized of a good, sure and indefeasible title to these lots.   Upon his death that title vested by descent in his heirs at law, the plaintiffs in these actions.   Moses Rawlings had then neither title nor pretense of title.   Rawlings conveyed the lots to James D. Armstrong in 1850.   Armstrong took no title under the deed, because Rawlings had none to convey.   Two years afterwards the Legislature pass an act, which we are told gives to Armstrong a good title under this very deed from Rawlings.   And how?   By taking from the plaintiffs their title and giving it to him.

I respectfully submit, that in a free country such legislation is not to be borne.   The authorities have been referred to by

my colleague, but 1 call the special attention of the court to
the decision of *C. J. Mellen*, in the case of the *Proprietors of
the Kennebec Purchase vs. Laboree & others*, 2 *Greenlf's
Rep.*, 288, where, in reference to a statute similar to the act
of 1852, except that it honestly avowed its purposes in its title,
and bore them upon its face, the court, upon great advisement,
held, that so far as the statute was meant to go back and affect
vested rights, it was retrospective and void.  The courts do
not stop to inquire whether the restraint upon the law making
power is to be found in the constitution or not.  They derive
that restraint from the principles of free government, and the
great rules of right and justice.  Such legislation is regarded
as violence, not law.  2 *Greenlf.*, 291.  7 *Johns.*, 493,
*Bonhom's case*, 8 *Rep.*, 118.  9 *G. & J.*, 408.  *R. M.
Charlton's Rep.*, 333.  Acts of limitation are said to refer to
the remedy, but if in readjusting the remedy the Legislature
destroy the right, the act will be regarded as retrospective and
void.  4 *Wheat.*, 207.  8 *Mass.*, 430.  2 *Greenlf.*, 293.

Again, what is to be the effect of the act?  We have seen,
as applied to the case of a party entering under claim of title,
it would not change the rule, and that in reference to that of
a *tort-feasor* it will not be permitted to change the rule.  The
result is, that prior to the day of its passage it can have no
operation at all.

But what in point of fact is the possession shown in this
case?  Rawlings insists that he entered in 1833.  Give him
the benefit of all he alleges.  He had no deed when he
entered.  He was an intruder from the start.  But he quit
the possession in 1850, when he conveyed to Armstrong.
Now, being a mere wrong-doer, the moment he quit the pos-
session of the rightful owners attached, and Armstrong when
he entered was a new disseiser.  Rawlings could not convey
his inchoate right of possession to Armstrong, for the simple
reason that a party cannot convey a trespass.  It might as
well be said that he could convey a slander or an assault.
They could not tack the possession of Rawlings to that of
Armstrong.  5 *Md. Rep.*, 275.  Armstrong was the first to
enter under color of title, and that was in 1850, but four years

before this suit was brought, to say nothing of the subsequent breaks in the possession.

But in point of fact Rawlings never entered upon the lots at all, either with or without claim of title. He went to one of the lots in 1833, walked over it to look at it. Then entered *Winebrenner's* house, put the key in his pocket and walked away with it. And this is his entry. The lots moreover are all in wood, no improvement on either. And in what manner there is to be a "user and ownership" of unenclosed woodland, where the wood is all standing, no part of it cut or used at all, it is difficult to imagine.

Mason, J., delivered the opinion of this court.

This is an appeal in an action of ejectment. The plaintiff having shown a perfect title upon paper, rested his case. The defendant places his claim to title to the lands in controversy, upon the evidence of *possession* set out in the record, and relied upon under the act of 1852, chap. 177, sec. 2. Our first duty then is, to ascertain the meaning and legal effect of this section. The provision in question is, "actual enclosure shall not be necessary to prove possession, but acts of user and ownership other than enclosure, may be given in evidence to the jury to prove possession."

It is clearly not within the scope of the legislative power, to give to a law the effect of taking from one man his property and giving it to another, by any new rule of tenure, retroactive in its character. Therefore the legislature could not say, by a retroactive act, that the mere possession of a *tort feasor*, without actual enclosures, could divest the real owner of his title, and the reason is, that the law having been different, the real owner relied upon it as his protection, and took no steps, as he might otherwise have done, to defeat a result which could not have been foreseen under the law, as it stood previous to the new rule. If a party should permit another to occupy his land by enclosures, under an adverse claim, for more than twenty years, his title is gone. This results, because the law announces, that every man holds his land subject to have his title defeated in the manner indicated, and if he does not guard

Thistle, *et al.*, *vs.* The Frostburg Coal Co.

against such a contingency it is his own fault.   On the other hand, the law has been, previous to the act of 1852, that occupation of land by a wrong doer, without enclosures, would have no effect upon the title of the real owner, and hence the law imposed upon the latter no obligation to defeat such wrongful possession in order to protect his rights, as it did in the case of possession accompanied by enclosures.   Hence, as we have said, it was not in the power of the legislature to change this rule of law, so far as to give it a retroactive operation, because it would virtually be taking the land of one man, held by a good legal title, and giving it to another, who the law has said had none.

Notwithstanding the broad language used, we do not understand this court as intending to go further, in the case of *Warner vs. Hardy*, 6 *Md. Rep.*, 525, than we have gone in this. That was a question of possession under want of title, besides the bearing on this point, of the act, within purview of the constitution, was not raised.

It is equally clear that it was within the power of the legislature, to alter and remodel the rules of evidence and remedies, to which parties claiming title and possession of land, might resort, and therefore a law would be constitutional which merely declared that, evidence which would be sufficient to support a claim to title in equity, might be made availing for the same purpose at law.   Hence it follows, that if the defendant in this case has shown a claim to this land which equity would recognise and enforce, the legislature might properly say, that the same evidence might be used in an ejectment, and that upon such a claim or foundation such acts of possession as those which are enumerated in the act of 1852, might be relied upon to support title.   The case then resolves itself into these two questions, namely, 1st, Has the defendant proved a sufficient possession to gratify the requirements of the law generally, and especially of the act of 1852; and 2nd, Has he shown such an equitable claim, or color of title, to the land, as to support the acts of possession, as now set up and relied on as giving title?

The defendants' case mainly rests upon the evidence of Rawl-

ings. While we admit that this witness, from his relations to the case, does not occupy a favorable position before this court, appearing as he does to prove his own claim, still as there are no legal or technical objections to his competency, we must treat him as a good witness, and his evidence as entitled to credit.

After having stated the claim of title under which he alleges to have gone into the possession of this lot, he says, that in 1831, 1832 or 1833, "he took possession of the two lots and held them up to the time he sold them to Armstrong," which was on the 29th of March 1850. *Possession* being a question of law to be determined by the court, upon the facts in the cause, and that being the very point at issue in this action, it was not competent for the witness to assume to decide it by stating that he *took possession*, &c. He should have stated the acts which he did, and which he supposed amounted in law to *taking possession*, and permitted the court to pass upon them. This statement, therefore, was not evidence to go to the jury. The subsequent testimony of the same witness, upon his cross-examination, as to the manner in which he took possession, is not subject, it is true, to the same objection, still it is insufficient to show such possession as was contemplated by the act of 1852. It consisted simply in offering to sell the lots, going upon and walking over them, and locking up the house and taking away the key. Independent therefore of the testimony of Rawlings, we are to ascertain whether there is sufficient evidence in the record, to show an adverse possession for upwards of twenty years, consisting of "acts of user and ownership?" The additional evidence upon this point, shows occasional cutting of timber from the lot, by permission of the alleged owner, his assertion of ownership of the property, and that the lots were known in the neighborhood as Rawlings' property. Upon this last point, however, the evidence is contradictory, for some of the witnesses in the neighborhood affirmed, that the lot in question was known as Thistle's lot.

As the act of 1852 is in contravention of the common law, we are not disposed to give it a very *liberal* construction. Possession therefore claimed under it, must be proved with clear-

ness and precision. It must cover the full period of twenty years, it must be adverse, exclusive and unbroken, and *the acts of user and ownership*, relied on, must be such as will comport with the character of the claim or title of him, who asserts ownership against all the world, and should not consist of acts, merely, which might be done by any and all persons with impunity, in common with him who claims to be the real owner. The witness Winebrenner says, for example, "that it was usual about there, if a man wanted a stick of timber to go upon any man's land and cut it." This was no doubt true, as to the land in question, as it was rough, mountainous land, and in timber, and, therefore, the mere cutting of wood, under such circumstances, where it was of little or no value, can hardly be regarded as an act peculiar to the ownership of the property. To give permission to do that, which most persons in the neighborhood assumed to do without permission, cannot be regarded as such an act of exclusive ownership as was contemplated by the act of 1852. Neither do we regard the mere *assertion* of a claim to the land, as an *act of user and ownership* within the statute. Indeed we can discover no acts on the part of Rawlings, in regard to this property, running over the whole twenty years, that were not perfectly consistent with acts that might have been committed by any person in the neighborhood, with the same impunity, except the single circumstance of *having locked up the house and taken away the key*. This would have been unquestionably an act of ownership, and one of great weight, if there had been no question as to whether or not the lines of the lot embraced, in fact, the house. But we find this disputed, and the house actually claimed by, and the tenants afterwards paying rent to, the adjoining owner. In this way the force of the circumstance of *locking the door* is much weakened, if not entirely destroyed. When we remember that one of the ingredients or elements of title by adverse possession is, the hostile invasion of the rights of the real owner, we cannot discover, as the house was claimed by both Thistle and Winebrenner, whose rights were intended to be invaded by this act of *locking the door*.

It is not pretended that any one was put in actual possession,

to represent Rawlings, prior to 1835, when Klink, it is alleged, *was placed* in the *house* as Rawlings' tenant *of the whole premises*. Conceding that the possession was perfect by reason of that act, and continued unbroken, it was still not sufficient, in point of time, as twenty years had not elapsed when this suit was instituted.

Having determined that the acts of Rawlings prior 1835, were not sufficient to amount to *possession*, under the act of 1852, we are relieved from the necessity of passing any opinion upon the question, whether Rawling's claim or title to the land was sufficient to support acts of user and ownership, and to rescue him from the character of a mere *tort feaser*: in other words, whether he had an equitable or colorable title?

The only remaining point is, the sufficiency of the plaintiff's prayer. The court being under no obligation to suggest prayers or instructions to counsel, might well have rejected the plaintiffs' prayer, upon the ground alone of its having been too general, and if appealed from, whatever merits might have been discovered in his case, this court would have been confined to the question of the sufficiency of the prayer, and constrained to affirm the ruling thereon. Upon this subject, this court will in future adhere to the law, as announced in the cases of *Tyson vs. Shueey*, 5 *Md. Rep.*, 540, and *Hatton vs. McClish*, 6 *Do.*, 407. But the court did not confine itself to the mere rejection of the prayer, but proceeded to volunteer an instruction, which is not only usual, but eminently proper, embracing its views of the law, and from this an appeal was also taken. The questions which we have discussed in the preceding part of this opinion, arise out of the instructions given by the court, which, as we have endeavored to show, were erroneous.

*Judgment reversed and procedendo awarded.*

In the case of *George P. Thistle and others, vs. Francis Hammers*, which was an ejectment by the same plaintiffs for lot No. 3980, the facts of which are substantially the same as in the preceding case, and was argued by the same counsel, MASON J., delivered the opinion of this court,

The questions involved upon this appeal are, in all material respects, similar to those decided heretofore in the case of *This-tle vs. Frostburg Coal Company,* and for the reasons assigned in the opinion filed in that case we reverse this judgment.

*Judgment reversed and procedendo awarded.*