Mr. Justice HagNER
delivered the opinion of the court.
The bill in this case, filed by John W. Ebbinghaus, charges that he is trustee in equity under the appointment of the Supreme Court of the District of Columbia, and, as such, is seized of lot No. 9 in square 80, in the city of Washington, and holds the same as successor to a certain D. Reintzel, deceased, for the “ German Calvanist Society,” in accordance with the intent of a certain Jacob Funk, the original owner of the property, in trust for the use and benefit of the legal successors and beneficiaries of the said u Calvinist Society,” whoever they may be; that he is ready to pay the rents,, issues and profits thereof when received by him into court, to be disposed of as it shall direct, and to perform all the duties of his office according to law; and that he institutes this suit with the view and purpose of procuring the settlement and determination, by the court, as to who are the legal beneficiaries under said trust. He further charges that certain John G. Killian and others, asserting themselves to be the trustees of the German Evangelical Concordia Church,, at the corner of 20th and G streets, N. W., in Washington city, claim to be the legal beneficiaries of the said trust for religions purposes, and, as such, entitled to the rents, issues. *249 and profits of the said lot No. 9; that said trustees haves from time to time, received large sums of money arising from such rents, issues and profits, without the consent of the said Reintzel, or of the complainant as his successor, as trustee; and he charges they ought to account to the complainant, as trustee, for these rents, issues and profits, and in the meantime pay them into court to abide the determination of the suit.
He further charges that a certain August Seivers, and others, claiming to be trustees of the Eirst Reformed Church of the city of Washington, D. C., also claim to be the legal successors of the “ Calvinist Society,” and, as such, to be the legal beneficiaries of the said trust, and entitled to receive the rents, issues and profits, and the estate therein; and that the said Seivers and his co-trustees are expected to sue the complainant for the recovery of their supposed rights. He prays that an account may be taken of the rents so received by Killian and his co-trustees in behalf of the “ German Evangelical Concordia Church;” that said trustees may be decreed to pay into the court whatever may be found due on account of said rents; that they and the said Seivers and his co-trustees, and all other persons, may be enjoined from bringing suit against the complainant in respect of the said property, or interfering further with the same, until the decision of the court shall be known in the premises; and that the respective claimants so asserting themselves to be the beneficiaries of the trust may be required to interplead together in this suit; that all necessary accounts may be taken, and for further relief. Killian and his associates, as the trustees of the “ German Evangelical Concordia Church,” in their answer, deny the title of the complainant as trustee, and claim the property in behalf of the church of which they are trustees. They deny their accountability for the rents and profits, except to the said Concordia Church, and insist that the right and title of the property is in them; and aver that possession of the same has been in the church of which they are trustees for over thirty years.
Seivers and others, as trustees of the Eirst Reformed *250 Church of the city of Washington, answer the bill, admitting in general its allegations; insisting that their church is the legitimate successor of the Calvinist Society, and claiming that they are the rightful beneficiaries under the trust set forth in the bill.
A large amount of testimony was taken on behalf of the respective claimants, and the case has been argued with ability and care.
It appears from the proof that about the year 1832 a large number of Germans found themselves domiciled in the city of Washington, which then contained no church where the services were performed in their own tongue. The bond of nationality proved stronger than devotion to religious forms, and they all, from time to time, assembled in common worship conducted in the German language by some of their members; and the testimony discloses the rather remarkable fact that this company of foreigners, composed of Jews, Roman Catholics, Lutherans and Calvinists, for a considerable time continued in harmony to attend the same religious exercises.
About the close of the year, at one of these religious meetings, it was mentioned by some one present, that he understood there were two lots of ground in the western part of the city, which had been set apart by a certain Jacob Funk for the benefit of German religionists. It was thereupon decided that inquiry should be made to ascertain the facts. The result of the investigation disclosed that on the assessment books of the city there stood in the name of “ D. Reintzel, for Lutheran Congregation,’? a lot at the corner of Twentieth and G streets, and in the name of “ Reintzel, for Calvinist Society,” a lot at the corner of Twenty-second and G streets.
It appears from the records of the District, in proof and from recitals in the statutes of Maryland and of the United States, that, as far back as 1770, a certain Jacob Funk became the proprietor of a parcel of land in Prince George’s county, Maryland, reaching in a northeasterly direction from the neighborhood of what is now known as Fasby’s wharf on the Potomac river, in Washington city, towards *251 Pennsylvania avenue; that in that year he caused a plat of a town to be made, which was entitled “ the plan of Hamburg,” upon 'which he divided his property into streets, squares and lots; and that he executed conveyances of many of these lots, which were recorded in the office of the county court of Prince George’s county.
In 1791 the legislature of Maryland passed a law, chapter 45, reciting that the President, by virtue of several acts of Congress and of the assemblies of Virginia and Maryland, by his proclamation in March, 1790, had declared that the ten miles square for the permanent seat of Government for the United States should be included within designated lines npon both sides of the Potomac; that Notley Young, and Daniel Carroll, of Duddington, and many others, proprietors of a greater part of the land so laid out in the city, had conveyed their lands to trustees, agreeing to give up part to the United States, and subjecting another part to be sold to raise money as a donation to be employed in establishing the seat of Government; and that many of the proprietors of lots in Hamburg had agreed to subject their lots to be laid out anew, giving up one-half to be sold and they to be reinstated in one-half of the quantity in a new location, &c., in the city, but that some of the proprietors of Hamburg, from imbecility or other causes, had failed to come into such agreement, and it appearing to the general assembly just and expedient that all the lands within the city should contribute in due proportion in the means which had already greatly enhanced the value of the whole, and that an incontrovertible title should be made to the purchasers under public sanction it was enacted that in all cases where persons holding lots in Hamburg had failed to make such conveyance to the trustees public notice should be given and an allotment thereafter made, assigning to each holder of lots in Hamburg a lot on the plat of the city equal to one-half in quantity of their original holding; and that all persons to whom allotments and assignments of lands should be made by the commissioners according to this law should “ hold the same in their former estate,” in lieu of their former possessions.
*252 It' is further shown that a report was made by the commissioners appointed under this law, specifying the parcels of land which had been allotted by them to the former owners of lots in Hamburg, in lieu of their original lots; and that in accordance with the statute the commissioners conveyed said substituted lots to such persons; and that among the lots received under such circumstances was lot No. 9, in square 80; the vacant lot in controversy, which was conveyed to “D. Reintzel for Calvinist Society,” by a deed of conveyance of the 28th of June, 1793, in lieu of lot No. 75 standing in the same name-on Funk’s plat; and on the same day lot No. 5 in square 121 was conveyed to “ I)'. Reintzel for Lutheran Congregation ” in lieu of lot No. 183 on Funk’s plat.
It does not appear, and it is not probable, that the inquiry as to the lots which was set on foot by the Germans, resulted in the ascertainment of any of the foregoing particulars as to the title, or disclosed anything further than the entries in the assessment books. But shortly afterwards they took possession of the lot at the corner of 20th and G streets, and by the joint efforts of all the Protestant Germans, a church was erected for their common use; the Jews and Roman Catholics having previously withdrawn and allied themselves with congregations of their own faith.
The purpose of those aiding in the erection of the cburch seems rather to have been the establishment of a place where they might listen to Protestant religious teaching in their own language, than the inculcation of any of the peculiar tenets of the different Protestant churches. The evidence shows that Lutherans and Calvinists contributed alike towards the building ; and that after its completion the Holy Communion, from time to time, was administered within its walls, alternately, according to the respective usages of those denominations. The inscription over the principal door of the edifice, “ Concordia Church,” seems to have been conceived in sympathy with this sentiment and purpose.
For many years thereafter the lot at the corner of Twenty-second and G streets, the subject of the present controversy, *253 remained unoccupied. No taxes were assessed against it by the municipality, showing that it was recognized as church property. Finally it was taken possession of by the persons claiming to act as trustees of the Concordia Church, and it has since been leased and rented to different individuals, by the trustees of that church, who received the rents, as they accrued, and who are still in its possession.
After the joint occupancy at the church building had continued for a considerable time, an attempt was made by the pastor then in charge to introduce and inculcate the distinctive forms and doctrines of the Lutheran Communion; and this led to the withdrawal of a considerable number of the Calvinists, and the establishment by them of the First Reformed Church.
Many of the pronounced Lutherans had also withdrawn and joined themselves to the Lutheran churches which had been erected in the city. But there still remained, as attendants of the Concordia Church, some of its original promoters, who formed the nucleus of the present congregation, which claims the vacant lot as belonging justly to the Concordia Church to the exclusion of all others. 1
1st. The trustees of the Concordia Church first object to the form of the present proceeding. They rely upon the principle of equity pleading, that it is essential' to the maintenance of a bill of interpleader that the plaintiff should occupy a position of entire impartiality between the different claimants, and be in no way interested in the result of the litigation, since otherwise he might, indirectly, influence the decision; and they insist that the complainant in this casé-is disqualified to maintain this suit since he is shown by the proof to be the minister of the First Reformed Church, one of the defendants.
But, in our opinion, this fact does not necessarily commit him, in his capacity as trustee, to the interests of the Reformed Church.
The object of the proceeding is to determine, and thereby to instruct him, in whose behalf he shall continue to hold the property; and, as trustee, he is equally interested and bound *254 to uphold the rights of the one set of claimants, or the other, according as the question may be decided by the court.
The complainant expressly disclaims all interest in the result, and annexes to the bill the usual formal affidavit, required by chancery practice in such cases — that he does not collude with either claimant to the trust property, but brings the suit for the sole purpose of procuring from the court a determination of the question as to which of the rival trustees are the legal beneficiaries of the trust.
Under his appointment as trustee by the court, he holds the property as Reintzel held it. If Reintzel would now be adjudged to stand as trustee for the benefit of the Concordia, trustees, so must the claimant ; if for the benefit of the Reformed Church, the complainant equally must be held to be trustee for that organization ; and if it should be decided that neither of these distinctive organizations is entitled, but that the property belongs to some other association more properly representing the “ Calvinist Society,” then, as trustee, he is bound to maintain the rights of that association against both the others, or be removed from his trust.
The general principle asserted in behalf of the Concordia Church is undoubted. But there are bills not strictly of interpleader, which are known as “bills in the nature of bills of interpleader and we regard the present as of this character.
It is laid down in works of authority, that, although a bill of interpleader strictly so called lies only where the party applying claims no interest in the subject-matter, yet there are many cases wliere a bill in the nature of a bill of inter-pleader will lie by a'party in interest to ascertain and establish his own rights, where there are other complicating rights, between third parties. “ For instance, if a plaintiff is entitled to equitable relief against the owner of property, and the legal title thereto is in dispute between two or more persons, so that he cannot ascertain to whom it belongs actually, he may file a bill against the several claimants in the nature of a bill of interpleader for relief. In these cases the plaintiff’ seeks for relief for himself, whereas in an interplead- *255 ing bill strictly so called, the plaintiff only asks that he may be at liberty to pay the money or deliver the property to the party to whom of right it belongs.” Story’s Eq. PL, §279,5.
To the same effect it is stated in Story’s Equity Jurisprudence, §817, a and b, that an agent of one of two parties can be complainant in a bill in the nature of a bill of inter-pleader where the other party claims under his principal. And so it has been held that a public agent may interplead independent claimants.
¥e consider that this bill is maintainable upon well-settled principles of equity jurisdiction.
Courts of chancery have supervision and control of all unincorporated societies or associations. With respect to them they have the power of prevention of acts contrary to law and prejudicial to the interests of the community or to the rights of individuals, and can afford specific relief where a recovery in damages would be an inadequate remedy for the wrong. 62 Penn. St., 428 Kisor’s Appeal.
Where, by reason of the numbers of the parties and the character of their rights, damages are unsuitable as a means of redress, it is settled that equity will apply the required remedy. As in 30th Maryland, 38, Gilbert vs. Arnold, where the trustees of a Methodist church applied for an injunction to restrain interference with the property by rival claimants, the court declared that, conceding the complainants had a full and adequate remedy at law for the acts of intrusion, yet, taking into consideration the number of the beneficiaries entitled under the trusts, the vexatious litigation and recurring multiplicity of suits which would necessarily arise if the settlement of these questions were to be remitted to the law, it "was proper that equity should assume jurisdiction and grant relief. The same doctrine is announced in the well-known case in 2d Peters, 585, Beatty vs. Kurtz.
The jurisdiction of chancery is exercised in this class of cases upon the ground of a trust. It is the duty of these tribunals to give effect to the powers of the trust if they be legal, and to that end they must ascertain and determine its *256 scope and object ; in that investigation they are authorized to resort to the early history of the church, as contained in standard and authentic works on the subject, prior in date to the existence of the particular controversy.
2d. Believing, then, that the complainant has full right to maintain this suit, the next question is, for which of these contesting parties, if either, should this property be held by the trustee ?
"W e have' seen that this property stood on the assessment book in the name of “ D. Eeintzel for Calvinist Society.” The Calvinist Society thus described, or its legal successor, must of course be the properly entitled caimants, if the trust is a valid one.
Have the defendants, Killian and his co-trustees of the German Evangelical Concordia Church shown themselves entitled as the beneficiaries of the trust ?
It appears that since the institution of this suit, these trustees for the first time have applied to become incorporated uuder the general law af the District by the name of “The German Lutheran Evangelical Concordia Church,” although they insisted, when the proof was taken, that a considerable proportion of their members held the Calvinist doctrines.
It seems to us clear that the Concordia trustees have failed to show that they are the successors in doctrine of the Calvinist Society. It is part of the general history of the world that after the Protestant Keformatiou had been set on foot by Luther, the first authoritative declaration of the principles of the great reformer was presented to Charles V, June 25, 1530, at the city of Augsburg, in certain articles of faith embodied in what is known as the Augsburg Confession ; and this confession, revised by Melancthon, under the supervision of Luther, has ever since, it is believed, constituted the accepted creed of the Luthern Church. Soon that came to pass among the reformers, which characterizes the progress of all reformations. Those who have taken the initiative in such great enterprises soon find' themselves left béhind by the more enthusiastic and enterprising of their *257 former followers. The more ardent of the reformers soon ■declared that the reformation was incomplete ; that it was not as thorough as it should have been, and they especially ■censured the retention by the Lutherans of the practice of auricular confession, and their supposed doctrine as to the presence in the sacrament under the name of consubstantiation. These reformers of the Reformation, under the lead of Calvin, formulated their amended creed in what is known as the “ Ileidelburg Catechism,” which disputed the doctrine of consubstantiation, insisted that the .sacrament in both kinds should be given to the laity, discarded the use of the Hostie or consecrated wafer, and denounced in all its forms the practice of auricular confession to priests.
Now it appears distinctly in the proof that the books of doctrine in use in the Concordia Church, during all this time, have been those of the Augsburg Confession; and that wherever there has been a distinct attempt to define the doctrines of those worshiping there, it has disclosed an adherence to the Lutheran, rather than the Calvinist, tenets ■of belief and practice. The predominance of this distinctive tendency is further evinced by the circumstance already alluded to, that since the institution of this suit their trustees have elected to be incorporated under the name of “ The German Lutheran Evangelical Concordia Church.”
Indeed, the claim that the Concordia Church holds the religious doctrines maintained by the Calvinist Society about the close of the last century, is so much at variance with the proof that the Concordia trustees have chiefly rested their claim of title upon possession — which, according to their answer, has continued in them for thirty years. It is well .settled that before parties can successfully maintain a title to land by possession alone, they must show that this possession covers the full period of twenty-one years; and that during all this time it has been actual, adverse, visible, notorious, exclusive and unbroken, with claim of title against all the world. Thistle vs. Frostburg & Co., 10 Md., 148; Baker vs. Glessee, 32 Md., 355.
But the proof establishes no such form or duration of pos *258 session by these claimants. Without the further comment upon the evidence, it is enough to advert to the fact, that less than twenty years since, by a resolution of the trustees of the Concordia Church, it was declared that unless the Calvinists within ten years from that date should erect a church on the lot in question it should be thereafter claimed absolutely by the Concordia Church; and as late as 1867 the members of the Calvinist communion of the city of Washington, publicly claiming title thereto, took measures to build on the lot a church for their own people, although they afterwards saw fit to change this purpose.
But even if possession uninterruptedly for twenty-one years had been shown in the trustees of the Concordia Church, such possession could only have been in behalf of the beneficiaries of the trust originally held by Beintzel, whoever they may be; and the Concordia trustees cannot invoke this length of possession against these beneficiaries. While they held possession it was in behalf of the real cestui qui trusts, under the trust impressed upon the property in the hands of Beintzel, and the statute of limitations, if openly pleaded, has no application to express subsisting trusts. Because of the privity existing between them, the holding by a trustee is the possession of his cestui qui trust, and wherever a trustee seeks to claim against his trust and thus destroy it, the courts hold that his tenure shall be reckoned according to his title as trustee. (Lieman’s Estate; 32 Maryland, 239.) And if it were true, as alleged by the Concordia Church, that a part of those composing their congregation has always consisted of Calvinists, the possession by the trustees was equally a possession for the Calvinists. Where the possession of a party is under and in privity with the estate of the person under whom such party claims, there could be no adverse possession against that person. Nutwell vs. Tongue, 22 Md., 419.
This length of possession is not presented by a plea of the statute against the right of recovery by the Beformed Church, but is relied on by the Concordia trustees as a circumstance from which a presumption may arise of the execu *259 tion to them of a grant of the land. But this presumption can never arise in the absence of such possession as the law requires as a preliminary condition. It is clear then that we cannot decree in favor of the trustees of the Concordia Church.
Sd. Has the First Eeformed Church of the city of Washington shown such title as will enable this court to decree in its favor ?
It is not the same in name with the Calvinist Society; The believers in the doctrine of Calvin have been less tenacious of retaining the name of their great leader than the Lutherans, for there are numerous denominations of Christians who have adopted the distinguishing doctrines of Calvin, under widely different names. But it is insisted on behalf of the members of the Eeformed Church, that they are the only proper successors of the religionists comprehended under the distinctive name of the “ Calvinist Society.”
Have they maintained this contention ?
We have been much impressed by the evidence of Mr. Bussell, a clergyman of the Reformed Church, which is given at large in the record.
It appears from the very intelligent narrative of this witness, who is a minister of the Eeformed Church, that the peculiar doctrines represented originally by the “ Calvinist Society” of the last century, and embodied in the Heidelberg confession, have been held under different names by the Eeformed Church in this country for more than a century.
Those names have been affected by various circumstances, as the nationality of the members and the location of the churches. Among these designations were “ High Dutch,” “German Presbyterians,” and “ Sacramentarians.” So, under the general denomination “ Calvinists,” was included the term “ German Calvinists; ” and the witness concludes his examination of the subject by the declaration of his belief that the Eeformed Church of the United States is the only historical successor of the church intended by the name of *260 the “ Calvinist Society.” Ve have also been referred, as part of the public history bearing upon the controversy, to the book of the Rev. Michael Slatter, a distinguished divine of the Reformed Church, who was sent to this country about 1740 by the Calvinists, or Reformers, of Holland, to visit their brethern in faith who had settled in different parts of the then colonial governments. Slatter reports that he found numbers of his co-religionists settled in various parts of Pennsylvania, in the upper counties of Maryland, and in the valley of Virginia, and he visited some of them in the neighborhood of the Potomac. It is also part of the public history of the country- that Calvinists, under the name of the Reformed Church, penetrated as far south as North Carolina; and that one-third of the convention that adopted the famous Mecklenburg Declaration of Independence which preceded the great Declaration by more than a year, and is thought by many to have been its prototype, and comprehending the president and other prominent members, were co-religionists of Slatter, who had brought to this country the same love of independence and liberty in civil government which they bad claimed in matters of religious belief.
The Statutes at Large of Maryland contain acts of incorporation by its legislature at a very early day of congregations of the Reformed Church; and one of these Reformed Churches under the name of the German or High Dutch Christian Reformed Church had been established in that State in the neighborhood of Frederick many years before 1784, was engaged in a mandamus suit about the year 1794, to determine the right of occupancy of its pulpit. This contest is fully reported in the case of Runkel vs. Winemiller et al., 3 Harris & McHenry, 429.
A distinctive feature in the belief of the religionists known as the Reformed Church represented under these different denominational titles, is their adhesion to the tenets of the Heidelberg Confession, unembarrassed by other distinguishing points of doctrine which are held by the Baptists and other religious bodies having a Calvinistic origin. And if we are to be guided by the evidence, wre are compelled to *261 believe that the dogmas of that confession constitute the creed of the Reformed Church, essentially as they were maintained by the “ Calvinist Society ” during the last century, and ever since their first promulgation by the Calvinist branch of the Reformers.
4th. But there is nothing in the record expressly declaring that the benefits of the trust, which we have found devolve upon the Reformed Church, should enure to a church of that communion of any particular nationality or location; and the next inquiry is, whether we are justified in declaring that its advantages can be confined to the First Reformed which is represented by August Steivers and his co-trustees, who are Germans, and is located in the city of Washington, to the exclusion of their co-religionists elsewhere?
In the absence of such express declaration in the trust itself, we must be governed by the circumstances surrounding the trust at its inception. And in adopting this aid to a correct, conclusion we are supported by the authority of adjudged cases..
In Gibson vs. Armstrong, 7 B. Monroe, 487, where a deed executed in Maysville, conveyed property for the benefit of the “ trustees of Methodist Episcopal Church of America,” the court held that they were justified by the facts of the case in deciding that the benefit of the trust should secure to the Methodist Episcopal Church in Maysville.
In the case of Beatty vs. Kintz, 2d Peters, 585, there had been a dedication by a proprietor of a lot in Georgetown to “the Lutheran Church;” without the addition of words to confine its benefits to any local organization of that church. But the facts sufficiently evinced the intention of the donor to restrict the benefits of the property to his neighbors, rather than have it frittered away uselessly by subdivision among the Lutheran Church at large; and the Supreme Court properly held that the German Lutheran Church of Georgetown was exclusively entitled to its enjoyment.
By a similar consideration of the circumstances disclosed in the present case, we are led to the conclusion that the successors in doctrine of the Calvinist' Society, of German *262 lineage, and worshiping in Washington city, should be held to be the exclusive beneficiaries of the trust. Certainly the Dutch and German names, “ Funk,” “ Reintzel,” and “ Hamburg,” would seem to indicate the affiliations of the originators of the trust and the nationality, most probably designed to be benefitted; and the position of the lots, their unimportance to the church in general and their adaptation to use by a local congregation, would repel the idea that men of ordinary sense would think it worth while to make the church in general, the beneficiary of what to it would prove the merest trifle. Accordingly we recognize in the trustees of the First German Keformed Church of Washington city the lawful successors of the “ Calvinist Society,” mentioned in the deed of trust, and entitled to the beneficial interest in the lot in controversy, and to its rents, issues and profits.
5th. Other considerations have presented themselves in the progress of this examination, and among others, “ whether there is any invalidity in the trust in favor of an unincorporated religious body without the assent of the legislature of Maryland. The Statute of Charitable Uses, 43d of Elizabeth, ch. 4, never was in force within that State; and the constitution of 1776 invalidated any gift, sale or decree of land to any- minister of the gospel, or to any religious sect, without the leave of the legislature, except the sale, gift or decree of not exceeding two acres of land for a church and burying ground, which was to be improved, enjoyed or used only for such purpose.
There is nothing in the record to prove that the original Hamburg lot was the gift or devise of Jacob Funk. He sold and conveyed a large number of the lots described on his plat, and the only support of the idea of a donation of the church lot was the statement made at the meeting of the Germans in 1832. But whatever he did was accomplished in 1770, before the adoption of the Maryland constitution, which was more restrictive than the English statutes of mortmain in force in the province. That which was conveyed to Keintzel in June, 1793, was to be held by him “as of his former estate in lieu of the former lot,” and the titles *263 though acquired in 1793, to the particular lot, related back to the acquisition of the property for which it was substituted before 1770.
That chancery had jurisdiction of devises and conveyances for charitable purposes before the 43d of Elizabeth, may be said to be settled elsewhere than in the State of Maryland, where the contrary is held in Dashiell vs. Atty. Grenl., 5 G. & J.
But it is decided that the acts of mortmain applied only to corporations exclusively, and that trusts made by feoffment, grant or devise to unincorporated bodies for charitable uses and purposes, not deemed superstitious, were not invalid. Wright vs. Trustees, 1 Hoff Ch., 248. And a religious purpose is a charitable purpose, in this respect, as declared by Eord Langdell in 1 Keen, 233.
Again, the Maryland act of 1791, under which the title to lot No. 9 was for the first time vested in Keintzell, in lieu of his former possession in the Hamburg tract, must, by ■every fair intendment be taken as a full legislative assent that the beneficiaries of the trust should have an effective and valid title to enjoy the property then deeded to their trustee, as a religious society, as their name proclaimed them to be. To conclude otherwise would be to impute to the legislature unfair dealing in transferring their original Hamburg property to others by “ incontrovertible title,” while reserving the power to invalidate the new title communicated under their own statute.
Erom the date of the deed to Reintzel to this time no claim has been presented by any one attacking Reintzel’s title, and all who have claimed the property have claimed “through him. Nearly one hundred years-have passed without the pretence of an adverse right against the validity of the trust.
After such an interval, under proper circumstances of possession, the courts would instruct a jury to presume the •existence of grants and the enactment of statutes to confirm ancient titles; and it appears to us that, in this case especially, that doctrine of repose might well be invoked to settle a *264 title claimed in tbe interest of good order and of the principles of morality- and religion.
We, therefore, see nothing' to invalidate the title of Reintzel by reason of the inhibition in the Maryland constitution of 1776, or in the antecedent law against the holding of property for the benefit of unincorporated religious societies, or upon any other ground.
And having arrived at the conclusion, as before announced,, that the trustees of the First Reformed Church of Washington, D. C., are to be regarded as the successors in faith of the Calvinist Society, we think the complainant should be decreed to hold the property for the benefit of that church. It follows from this that the possession of the property by the defendants, the trustees of the Concordia Church, has. been without legal authority, although we have no intention, of questioning that this possession was the result of an honest, belief of their right to do so.
It follows that their receipt of the rents and profits during-this period was without authority, and that they ought to-account to the complainant trustee for these rents and profits. But in view of the peculiar circumstances of the case, we have determined that these rents should not be claimed beyond the time of the filing of this bill.
It also appears that the Concordia Church has paid taxes-during this time; and if the taxes paid by them should exceed in amount the rents received up to the filing of the bill, the Concordia Church should be credited with the difference.
We shall pass a decree, in accordance with the principles of this opinion, enjoining the Concordia Church from interfering further with the possession of the lot; directing the' trustee, Ebbinghaus, to hold the property for the benefit of the First Reformed Church, and to account to them for the rents, issues and profits of said property, and requiring an account to be taken by the auditor of the amount of rents so received by the Concordia Church, and of their payments on -account of the taxes.