TAMBURO *v.* MILLER ET AL.
MILLER ET AL. *v.* TAMBURO
(Two Appeals in One Record)

[No. 37, October Term, 1953.]

330

*Decided December 8, 1953.*

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Charles J. Stinchcomb,* with whom were *S. Alfred Mund* and *Albert J. Goodman* on the brief, for appellant and cross-appellee.

*J. Royal Tippett, Jr.,* with whom were *Winson G. Gott, Jr.,* and *Hinkley & Singley,* on the brief, for appellees and cross-appellants.

HAMMOND, J., delivered the opinion of the Court.

The appellees and cross-appellants, members of the Miller family, filed suit in the Circuit Court for Anne Arundel County in trespass, q.c.f., and in response, the appellant and cross-appellee, Tamburo, filed a counter-claim, also in trespass q.c.f. The court heard the case without a jury and gave judgment for the defendants and cross-defendants.

The dispute involves the location of the true boundary line between lot 32, owned by Tamburo, and lot 33, owned by the Millers, in Block A of a development in Anne Arundel County known as Manhattan Beach. These adjoining lots run from Stinchcomb Road to Cypress Creek. When Manhattan Beach was prepared for sales in lots, a plat, based upon a survey by J. Spence Howard, was prepared, showing the lines of the various lots in the development. The developer conveyed the lots by reference to lot number on the plat, there being no metes and bounds description in the various deeds. The lots here involved, and adjacent lots, are shown on the plat as binding on Stinchcomb Road for a distance of fifty feet each, with parallel side lines running to Cypress Creek. No compass courses are shown for these side lines. Tamburo obtained a deed for lot 32 in 1923, although under a contract of sale, he entered into possession in 1920 and proceeded to clear his lot and erect a house. Also, he then placed a barbed wire fence, consisting of three strands along the side lines and road frontage of the lot, connecting four wooden pegs which he took to be the boundary markers of his lot. He says that the barbed wire fence ran from fence post to fence post on the line between lots 32 and 33 and was attached at the shore line to a small pine tree. Soon after the fence was put up, Tamburo planted a hedge all along the fence lines. About 1939, he caused a boat house to be erected at the Creek, extending to the small pine tree, claimed by Tamburo to be at about the lot line, or eight and nine-tenths feet into lot 33, if the Miller claim is correct.

The Millers acquired lot 34 in 1924 and lot 33 in 1929. Irvin Miller, the son, testified that they knew of the barbed wire fence from 1924 on, describing it as "haphazardly" stretched from tree to tree, partly on one side of the line and partly on the other, "apparently denoting some boundary line". For the last fifteen years, that is, since 1937, Irvin Miller says the three strands of barbed wire have been on the ground. He admitted, on cross-examination, that there was a hedge along the fence line and that a Mr. Smith, who had been engaged in 1951 to put in fence posts for the Millers, had pulled some of it up. In 1938 or 1939 when Tamburo had his tenant construct the boathouse, the Millers protested that part of it was on their lot but did nothing more until 1950, when Benjamin Miller, the father, first wrote Tamburo, reminding him of this protest, saying that a recent survey showed that the boathouse was on lot 33 and requesting that: "that portion of your boat house situated on my land be removed."

The survey to which Benjamin Miller referred was made for him by James E. Hicks. Hicks described the survey as one which was difficult, but testified clearly and persuasively that he was confident that he had determined the true boundary line after having surveyed lots 29 to 35. He determined that the true division line between lots 32 and 33 was as shown on the plat of Manhattan Beach, and thus found an encroachment, under the Tamburo claim, of eight and nine-tenths feet on the Miller property. The Hicks survey was made in June, 1950 and checked in 1952. On the first occasion, he found the three strands of barbed wire lying on the ground, and on both visits he found a hedge, although he says it was spotted and more underbrush than hedge.

After the Hicks survey and the refusal of Tamburo to respond to letters, the Millers employed Smith to build a fence along the line determined by Hicks to be the true division line. Four steel posts were put in the ground by Smith. Tamburo immediately either pulled or dug them out.

J. Revell Carr, surveyor of Anne Arundel County, was employed in the fall of 1952 by Tamburo to make a survey. He testified that he was unable to make an accurate determination of the true line because of the surveying uncertainties and difficulties inherent in the Manhattan Beach development. He did make a location survey showing what actually was on the ground. As he describes it: "I located the hedge which I was asked to do. I located the hedge on the northeast boundary. I located the hedge and fence on the southeast boundary. A concrete post there at the Creek, and a pine tree with wire attached to it, the boathouse and the machine shop, I located that with reference to the hedge, and with reference to the line, new line, of fence posts." He says further, in speaking of the line between lots 32 and 33, that: ". . . continuing on down towards the Creek, there was evidence of a hedge, part of which has been demolished, and portions of which now stand, continuing on down. . . There are three portions of the hedge which is still visible, but which remains two, three or four feet above the ground." Carr says that if the hedge line is projected to the boathouse, it would show that about three feet of the boathouse is over on lot 33. In other words, the combined testimony of the two surveyors shows that eight and nine-tenths feet of the boathouse are on lot 33 if the Hicks line is the true division line, and three feet are on lot 33 if the hedge line is the present division line. The plat prepared by Carr shows the Hicks line and the hedge line both projected to the Creek. Tamburo's present claim is that the hedge line is not the old fence line which ran to the pine true at the corner of the boathouse, although he testified, without reservation, that the hedge had been planted directly under the fence line at all places, and that he had instructed his tenant in 1939 to build the boathouse two or three feet inside his line.

The appellant claimed below, and claims here, that the Millers did not prove their title. However, two lawyers who had gone into the chain of title testified

that both Tamburo and the predecessor in title to the
grantors in the deed to the Millers of lot 33, took title
from the same grantor, the developer of Manhattan
Beach. The trial court held that the Millers had
brought the wrong action and should have proceeded
in ejectment. It determined, however, that: ". . . the
evidence offered is clearly indicative of the fact that
the boathouse encroaches on the property of the plain-
tiffs, and in a proper action, the plaintiffs would be
entitled to a verdict." The real cloud on the title of
the Millers and the weakness in their title actually re-
lied on by the appellant, is that lot 33 was sold by
a former County Treasurer to the County Commission-
ers of Anne Arundel County in a tax sale in 1930 be-
cause of default by a predecessor in title to the plain-
tiffs, in the payment of County taxes for the year 1927.
The court held the tax sale to be a nullity but to con-
stitute a technical cloud on the title which should be
removed by appropriate proceedings. At the argument
of the case, we were told that the County Commis-
sioners of Anne Arundel County had given a deed to
the Millers which removed this cloud on the title, and
the parties later furnished us with a certified copy of
that deed. Since the case must be remanded, we shall
assume the title of the Millers to be good and pass to a
consideration of the holding of the trial court that tres-
pass q.c.f. was not the proper action. The cases of
*West v. Pusey,* 113 Md. 569; *Giles v. diRobbio,* 186 Md.
258, 269; and *Corey v. Carback,* 201 Md. 389, 94 A. 2d
629, show clearly that trespass was available to the
Millers to test title under the facts which confronted
them. In *McAuliffe v. Lerch,* 189 Md. 672, relied on
by the lower court in holding that trespass was not a
proper remedy, no title was established to the disputed
area and neither actual nor constructive possession
shown. Judge Marbury pointed out for the court that:
"If, however, the plaintiff has a paper title to the whole
tract and is in actual possession of part of it, his con-
structive possession of the remainder is presumed."

The quoted language describes the situation of the Millers in this case.

We come then to the conclusion that the Millers hold the title to lot 33, as shown on the plat of Manhattan Beach, and as determined by the surveyor, Hicks, unless Tamburo has title by adverse possession of the triangle, whose apex is the admittedly correct division marker at Stinchcomb Road and whose long sides are the true division line between lots 32 and 33 and the fence and hedge line. Does the evidence show that Tamburo for the necessary twenty continuous years had actual, hostile and notorious possession of that pie-shaped piece of land under a claim of title or ownership which was adverse? If so, he became the owner. *Gee v. Ghee,* 194 Md. 328. The lower court held that: "The testimony of Mr. Tamburo is not convincing. The stringing of several strands of wire along makeshift posts, and attaching it to some trees somewhere near the correct boundary line, and the spotty hedges, are not such acts of adverse user as to make out a case of title by adverse possession." We think that the evidence shows a user by Tamburo which meets the requirements of obtention of title by adverse possession.

The earliest cases on adverse possession insisted strictly on actual and continuous enclosure for the necessary period in order to establish an adverse title. *Casey's Lessee v. Inloes,* 1 Gill, 430; and *Armstrong v. Risteau's Lessee,* 5 Md. 256. However, by Chapter 177 of the Acts of 1852 (now codified as Section 84 of Article 75 of the Annotated Code of Maryland, 1951 Edition), the Legislature declared that actual enclosure for the statutory period was not necessary to prove title, but that other acts of exclusive user and ownership may be shown as evidence of title. See *Warner v. Hardy,* 6 Md. 525, 539. As was said in *Storr v. James,* 84 Md. 282 at 290: "An actual enclosure though not necessary to prove possession . . . is, when erected by a party relying on a title by prescription, some evidence tending to show the character of his claim. It is his own affirmative

act. . . It defines the extent of his claim and marks the outlines of his actual holdings." Although this case is different on the facts because the fence was within the property lines for the purpose of the owner and not for the purpose of granting the adjoining property owner additional land, the test set out therein is sound.

It has been said often in the earlier cases that where a land owner extends his fence, through inadvertence, ignorance or mistake, as to the location of the true boundary line, so as to embrace the land of a neighbor, but with no intention of claiming the area thus enclosed, adverse possession cannot be established because the holding of the extended area is neither adverse nor hostile to the true owner. See, for example, *Davis v. Furlow's Lessee*, 27 Md. 536. The modern trend and the better rule is that where the visible boundaries have existed for the period set forth in the Statute of Limitations, title will vest in the adverse possessor where there is evidence of unequivocal acts of ownership. In this view it is immaterial that the holder supposed the visible boundary to be correct or, in other words, the fact that the possession was due to inadvertence, ignorance, or mistake, is entirely immaterial. See *Sadtler v. The Peabody Heights Company*, 66 Md. 1; *Rother v. Sharp St. Station Methodist Church*, 85 Md. 528, 530; and *Hiss v. McCabe*, 45 Md. 77. In *Jacobs v. Disharoon*, 113 Md. 92, the court held that one who continuously asserts ownership within an enclosure for more than twenty years in exclusive, notorious and actual hostile possession, would not be required to surrender the title by adverse possession merely because of his possession by mistake. The distinction seems to be that if the limits of the occupation be fixed with the intention of claiming them as *the* boundary line, the statute runs; but if the occupation and delineation of the boundaries appear to be merely provisional, with the intent to claim them as boundaries, if they are found to be proper boundaries, then the statute does not run. See *3 Washburn, Real*

*Property,* 6th Ed., Section 1968; and *Tiffany, Real Property,* 3rd Ed., Vol. 4, Section 1159.

It is clear in this case that Tamburo occupied the area which he had fenced in with intent to claim it all as his, the fences to be the boundary lines. His possession was exclusive, notorious, actual and hostile. The Millers admit that they knew of the fence, which was apparently intended to be a boundary, from 1924 on, at least until 1937. They admit that there was a hedge along the fence lines. They admit that they did nothing as to the boathouse which was built on the land claimed, except to make a protest which was not followed up. Whatever may have been the effect of permitting the barbed wire fence to rust out and fall to the ground, it cannot be said to evidence abandonment by Tamburo of his claim to the area he had originally taken as his own. The evidence makes it clear that the hedge supplemented the fences along all of their course. Tamburo says that it was six feet high in some places, smaller in others. Mrs. Tamburo says that it was as high as five feet. It was in existence and clearly defined from at least 1921 to 1952. Carr said that in 1952 it was two, three and four feet high in places. The fact that it was spotty does not weaken its effect as evidence of a claim of right to the area it enclosed, particularly since Irvin Miller testified that an agent of the Millers had pulled part of it up. We think that the erection of the barbed wire strands, the planting and continued presence of the hedge, and the building of the boathouse on the part of the ground claimed about the time the barbed wire is said to have fallen down to the ground, add up to obvious and actual notice to the Millers and the world that Tamburo was claiming ownership of the pie-shaped piece of land involved in the dispute, and that this claim and notice existed for more than twenty years continuously. Considering the character and use of the lot in question, there is little else that could have been done to show evidence more unequivocably of a claim of full ownership to the hedged-in

338

area. In our view, it is enough. Cf. *Bloodsworth v. Murray*, 138 Md. 631. We find, however, that the limit of the claim by Tamburo, which the evidence substantiates, was along the line shown by the surveyor, Carr, on his plat as the hedge line projected, so that approximately three feet of the boathouse built by Tamburo extended over the line into lot 33 and constitutes a trespass to this extent on the land of the Millers. Because of this, the Millers are entitled to judgment. It follows that Tamburo has title by adverse possession to some five and nine-tenths feet, at the Creek, of the original lot 33. *Jacobs v. Disharoon, supra.* Therefore, the Millers committed a trespass on his land when they sent Smith, their agent, on it to build a fence. The case will be remanded so that the question of damages, if any, to which Tamburo and the Millers are entitled, respectively, may be ascertained and proper judgments entered.

*Judgments reversed, and case remanded,*
*each side to pay its costs.*