FREED, ET UX. *v.* CLOVERLEA CITIZENS ASSOCIATION, INC.

[No. 196, September Term, 1966.]

*Decided April 10, 1967.*

The cause was argued before HAMMOND, C. J., and MAR-
BURY, OPPENHEIMER, McWILLIAMS and FINAN, JJ.

*Charles C. Hartman, Jr.* for appellants.
*Thomas M. Schifanelli* for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

To prevail in this Court appellants (the Freeds) must estab-
lish their right to tack their adverse possession of 0.6 of an
acre on the Rhode River (the triangular hatched area on
Plat B) to the adverse possession of their predecessors in title.
They lost in the court below because the trial judge thought
they had shown "no color of title whatsoever." In our recital
of the facts we shall refer again to Plat B. Plat A, about
which we shall also have more to say, is a part of the "Plat of
Cloverlea." Both are reproduced herein.

On 18 June 1926 Thomas Collison conveyed a 40 acre tract
in Anne Arundel County to Walter Lyon. The deferred con-
sideration for the transfer was secured by a purchase money
mortgage. On 13 July 1929 Lyon recorded the "Plat of Clover-
lea" which was dated 28 June 1926. It showed the subdivision
of about 34 of the 40 acres into 183 lots, 47 of which fronted
on the Rhode River. In 1933, as a result of the foreclosure of
the purchase money mortgage, title to the 40 acre tract, in-
cluding "Cloverlea," reverted to the heirs of Thomas Col-
lison.

Early in 1935 Donald Pitts, then about 26, his wife and his

parents visited Cloverlea. They were accosted by Emanuel Collison, one of the five children of Thomas, and asked to state their business. When they expressed an interest in buying a place for a summer home Collison, representing himself and the other owners, brought out a plat (probably the "Plat of Cloverlea") and showed them around. They liked what appeared to be lots 19 and 20. Since the only access to lot 18, according to Collison, was across a drainage ditch he urged the Pitts to buy it also. They agreed. The transaction was concluded by the execution of a contract of sale for lots 18, 19 and 20. In July 1938 the Pitts, *pere et fils,* obtained and recorded a deed for lots 18, 19 and 20.

Donald Pitts testified that, on the day they looked at the property, Collison picked up a stake and drove it into the ground on the north side of the drainage ditch near where it emptied into Rhode River, saying, "Your property line will run to here."[1] The southern boundary of lot 18 as thus pointed out by Collison ran along the north side of the drainage ditch, to the water's edge. The "bulkhead or retaining wall" shown on Plat B coincides with the north side of the ditch.

There are some deficiencies in the plat of Cloverlea (Plat A) which should be pointed out. There are no stakes, no pipes, no bench marks, no monuments, no Coast and Geodetic Survey markers, no works of man (except Cliff Drive, then a dirt road), no natural phenomena (other than Rhode River), no established lines or boundaries of adjoining properties shown thereon. There is not a line on the plat for which a compass course is shown. The depth of all lots and the frontage of some are shown by numbers followed by the more or less ($\pm$) symbol. Other than the lot numbers and the street names the only other useful information appearing thereon consists of the arrow pointing North and the scale ($1'' = 100'$). In short, like so many of the subdivision plats of the time, it was nothing more than a graphic representation of someone's notion of how the property might be developed. There can be little doubt that lots 18, 19 and 20 did not exist on the ground. They existed only on the

---

1. The statement was stricken by the trial judge. We shall have more to say about this.

plat. In fact, there was no information on the plat which would have enabled a surveyor or anyone else to locate accurately on the ground the boundary lines of any of the lots there shown.

Plat B was made by Warren Suitt who was employed by a surveying firm. He testified that his employer was hired "to establish the outlines of Cherry Stone Park" for the appellee (the association). He said "the plat of Cloverlea is not too easy to work with, *because of the lack of information.*" (Emphasis supplied.) He thought, however, they had done "enough work in there that * * * [they] were positive that * * * [they] did have the boundaries of Cherry Stone Park established." It will be observed that the northern boundary of the park, according to Plat A, is also the southern boundary of lot 18. Since Mr. Suitt did not explain how he arrived at that conclusion we can only suppose that he intended nothing more than the delineation on paper of the contention of his employer's client. We shall have more to say about that.

Pitts said that because of a spring on the east side of Cliff Drive the "ditch was formed by nature." He told how he put the first culvert under the road and how he "spent many hours in there keeping that ditch open." The low area north of the ditch was filled, little by little, at first with dirt from the digging of the basement and afterwards with dirt thrown up from the bottom of the ditch in the course of "keeping it open." He had a vegetable garden in the hatched area within 4 or 5 feet of the ditch where he grew tomatoes, beans, squash and cantaloupes. Flowers were planted. He remembers a row of peonies. There was a grape arbor and a willow tree. He kept the area mowed except during World War II when he was on duty with the Armed Forces. His pier having been destroyed by ice during the war he built one himself about in the center of the hatched area. On cross-examination he told how he had lost 8 to 10 feet of his property from erosion because he did not have a seawall. He said the stake driven by Emanuel Collison in 1935 disappeared as a result of the erosion. He never built a fence because "the ditch was a natural fence" and it "was a fairly straight ditch."

William J. Collison is a grandson of Thomas Collison. His mother owns lots 16 and 17. Lot 17 adjoins the south side of Cherry Stone Park. She also owns an undivided 1/5 interest in the park. He has lived in Cloverlea or within a few miles of it nearly all of his life. From 1937 to 1941 he was in charge of a crew that "used to take care of all those places along there, cutting grass, trimming." He was familiar with the ditch and "helped clean it out lots and lots of times" and he and his crew would mow the grass on the Pitts property "down as close to the ditch as * * * [they] could get which was within a couple of feet of it." He noticed there was a garden there (in the hatched area) "every year or so" except when Mr. Pitts was away.

Mrs. Edna Gessford had lived three doors from the property and she said she was familiar with the ditch and the hatched area. She remembers when Pitts sold to the Regans in February 1952. She said the Regans were looking for rocks to "build up a rock garden" and that "there was grass right straight to the edge of the ditch" except where flowers and shrubs were planted. She recalled also when the Johnsons, "a young couple," bought the lots from the Regans in June 1953. They "put in a vegetable garden down along the ditch, close to the edge of the ditch, plus a rock garden," she said.

William A. Irvine rented the property from the Johnsons from June 1954 to June 1956. He testified that "as far as * * * [he] knew, the ditch was the property line and * * * [he] maintained and cut the lawn all the way down to this ditch area all the way out to the water."

Harry Hasslinger testified his wife's parents bought lots 21, 22, 23 and 24 (adjoining the Freeds) in 1924 and that he had been a summer resident since 1931. He was "quite familiar with the ditch." In 1935 he helped the Pitts clean out the ditch. In respect of the hatched area he said Pitts and the subsequent owners mowed the grass, and "there was vegetable gardens, flower gardens * * * [and] a grape arbor." Regan, he thought "started a rock garden which was completed by Mr. Johnson."

The conveyances from Pitts to Regan and Regan to Johnson

were both by lot numbers. In October 1956 Johnson conveyed lots 18, 19 and 20 to the Freeds.

Freed, called as a witness by the opposing party, said that although "nobody trespassed" on the hatched area he had "ordered Mr. Price's children off" and some adults who "crossed that property." When he bought the property, Johnson showed him a stake between lot 20 and the "Hasslinger house" (lot 21) and told him his line went "right down to the ditch on the edge of the cliff." "Everyone believed it was his land" even after he constructed the bulkhead and the retaining wall. When called to testify on his own behalf he located the culvert under Cliff Drive by an X placed on each side of the road. He said the ground north of the ditch was mowed and the rock garden was still there. He drew a circle to indicate the location of the rock garden. The grape arbor is indicated by five dots just west of the rock garden. A heavy blue line shows where the peony bed was. He said "many of * * * [his] neighbors came around and watched" the bulldozer in operation when he filled behind the bulkhead near the water. He guessed he had put "a little over $3,600 in that pie-shaped area." He said the neighbors thought "it was wonderful * * * [that] he was improving the neighborhood."

At a meeting of the association in July 1961 Freed was given a copy of the Plat of Cloverlea. He said, "this * * * [was] the first time * * * [he had] ever seen" the plat. After he studied it he was concerned that he might have built the bulkhead on park land. He announced his concern to some members of the association. In February 1965, after the association filed this suit against him, he bought from his heirs the undivided 1/5 interest of Emanuel Collison in the park. The association acquired from her heirs the undivided 1/5 interest of Sarah Hardesty in September 1963. The remaining 3/5 is still owned by the heirs of Thomas Collison.

The principal witness for the association was George Kerwin Collison Hardesty, a son of Sarah Hardesty who was one of the five children of Thomas Collison. He moved to Cloverlea in 1951. His knowledge of the property before 1951 was obtained while attending an occasional oyster roast or picnic on

the beach. He did not recall a "clearly defined ditch." In 1954 he helped "clean out the ditch." He testified the hatched area "was never improved." He never saw a "fence" or a "no trespassing sign." (There is no evidence of the existence of a fence or a sign.) He has no recollection of a rock garden or a vegetable garden. There was a pier, he said, but it was not "substantial." He said Freed told him that he "had taken some of the community property" and that if the community made him move "he'd never speak to any of them again."

Lester Cunningham first started coming to Cloverlea in 1944. He didn't know Pitts. He never noticed whether the hatched area was seeded. He never noticed a vegetable garden or a rock garden. He never noticed a fence or a "no trespassing" sign. Nor did William C. Voight who also testified on behalf of the association.

Before trial the parties stipulated that the issues to be decided were:

1. Do the Freeds "have fee simple title, through adverse possession" to the hatched area.

2. If the first issue is decided in favor of the association "where is the boundary line between" lot 18 and Cherry Stone Park.

### I.

The Freeds contend the trial judge erred when he refused to allow Donald Pitts to testify that Emanuel Collison said, as he drove the stake, "Your property line will run to here." We think the trial judge ruled incorrectly, but it should be observed that our holding in *Wilt v. Wilt*, 242 Md. 129, 218 A. 2d 180 (1966), which we think disposes of this contention, was not published until about six or eight months after the decision of the trial judge. It is unlikely, however, that the exclusion of Collison's statement could have made much difference as the obvious purpose in driving the stake was to designate a boundary which, in the circumstances, could have been only the south line of lot 18.

### II.

The trial judge, in his opinion, said he was "convinced * * * there was never a definite period in time wherein this specific

area in question was ever occupied * * * in its entirety, and held adversely to the world." The association, in like manner, argues that the possession of the Freeds and their predecessors was not open, notorious, exclusive, hostile, or within a clearly defined area. A comparison of the circumstances in the case before us with those present in our recent decisions in *East Wash. Railway v. Brooke,* 244 Md. 287, 223 A. 2d 599 (1966) and *Blickenstaff v. Bromley,* 243 Md. 164, 220 A. 2d 558 (1966) makes it clear that the trial judge has misapprehended the situation and that there is no merit in the contention of the association. There has been advanced also the suggestion that the use made by Pitts and his successors was permissive. The association argues that since they were entitled, in common with other lot owners, to the use of Cherry Stone Park, their possession could not have been adverse. We do not agree. There is nothing on the plat of Cloverlea to suggest that Cherry Stone Park was dedicated to the use of the future residents of Cloverlea. The label "Cherry Stone Park" could as easily have suggested that Lyon or the Collisons had reserved it as a home site for themselves or as a site for some future commercial enterprise. In any event the use made of the hatched area by Pitts and his successors was entirely consistent with their ownership of lots 18, 19 and 20 and quite inconsistent with any notion that they were exercising merely their communal right to swim, sun bathe and picnic. After all one does not grade, mow, plant flowers, trees, grapevines and vegetables, and make a rock garden, in an area, the use of which one must share with several hundred others. In *Blickenstaff, supra,* at 171, we quoted with approval from 3 Am. Jur. 2d, *Adverse Possession,* § 14, the following:

> "It is sufficient if the acts of ownership are of such a character as to openly and publicly indicate an assumed control or use such as is consistent with the character of the premises in question. The standard to be applied to any particular tract of land is whether the possession comports with the ordinary management of similar lands by their owners, and if so, it furnishes satisfactory evidence of adverse possession."

## III.

Our consideration of the pivotal question whether the Freeds can tack their adverse possession to that of their predecessors in title must begin with *Tamburo v. Miller*, 203 Md. 329, 100 A. 2d 818 (1953). Although tacking was not an issue in *Tamburo*, the situation was generally similar to the case before us. Tamburo owned lot 32. Miller, who owned lot 33, claimed Tamburo had encroached upon his lot. The apex of the triangular wedge of land in dispute was tangent to the road on which both of these waterfront lots bordered. The base of the triangle was at the water's edge. One surveyor said the survey was difficult; the other (J. Revell Carr) said he could not determine the true line because of the surveying uncertainties and difficulties inherent in the Manhattan Beach Development. The boundary line claimed by Tamburo consisted of a few strands of barbed wire, mostly lying on the ground, replaced in spots by a hedge. We held Tamburo's possession was exclusive, notorious, actual and hostile. Judge Hammond (now Chief Judge), for the Court, said:

> "It has been said often in the earlier cases that where a land owner extends his fence, through inadvertence, ignorance or mistake, as to the location of the true boundary line, so as to embrace the land of a neighbor, but with no intention of claiming the area thus enclosed, adverse possession cannot be established because the holding of the extended area is neither adverse nor hostile to the true owner. See, for example, *Davis v. Furlow's Lessee*, 27 Md. 536. The modern trend and the better rule is that where the visible boundaries have existed for the period set forth in the Statute of Limitations, title will vest in the adverse possessor where there is evidence of unequivocal acts of ownership. In this view it is immaterial that the holder supposed the visible boundary to be correct or, in other words, the fact that the possession was due to inadvertence, ignorance, or mistake, is entirely immaterial. See *Sadtler v. The Peabody Heights Company*, 66 Md. 1; *Rother v.*

*Sharp St. Station Methodist Church,* 85 Md. 528, 530; and *Hiss v. McCabe,* 45 Md. 77." *Id.* at 336.

We cited *Tamburo* with approval in *Blickenstaff, supra.* The juxtaposition of *Tamburo* and the case at bar makes it apparent that there can be little doubt the possession of Pitts and his successors also was exclusive, notorious, actual, hostile and embraced all of the hatched area. As Judge Hammond also said in *Tamburo,* "actual enclosure * * * [is] not necessary to prove title." Code, Art. 75, § 33 (1966 Repl. Vol.)

The trial judge, in holding the Freeds could not tack the possession of their predecessors, relied entirely upon *Sachs and Sons v. Ward,* 182 Md. 385, 394-95, 35 A. 2d 161 (1943) and the cases cited therein. There it was said:

> "This [tacking] is precisely what this court had already decided cannot be done, the rule being that possession cannot be tacked to make out title by prescription where the deed by which the last occupant claims title does not include the land in dispute. *Fleischmann v. Hearn,* 141 Md. 463, 118 A. 847; *Hansel v. Collins,* 180 Md. 209, 23 A. 2d 686; *Oliver v. Hook,* 47 Md. 301; *Oberheim v. Reeside,* 116 Md. 265, 81 A. 590; 2 C.J.S. *Adverse Possession,* Sec. 131."

While the language quoted from *Sachs,* standing alone, is a familiar and correctly stated principle of law, it should be observed that the facts in *Sachs* beget a horse of a much different color than the facts in the case at bar. In *Sachs* the disputed parcel was actually part of a public street. After making the statement quoted above, Judge Melvin, who spoke for the Court, went on to say:

> "In weighing the equities here it is also to be borne in mind that appellants not only never acquired title to any portion of the bed of Sutton Street, but were expressly charged with notice in their own title papers and by the land records that this alley was always to be kept open and unobstructed, centainly as to the parties to the original agreements. They were

charged, too, with notice from the record that the bed of the alley was never owned by any of their predecessors. Therefore, when they found this first-floor structure across the alley, completely destroying its use for the purposes originally defined of record, *they took possession of it with knowledge that it did not pass to them under their deed."* (Italics supplied.)

However, we shall not undertake an analysis of the factual disparity between *Sachs* and the case before us because, in our judgment, this case falls into one of the exceptions to *Sachs,* which seems to be well recognized in other jurisdictions and which, until now, we have not had occasion to consider. The rule which prevails in most of the jurisdictions where the question has been raised is succinctly stated in the annotation in 17 A.L.R. 2d, 1128, 1131:

> "* * * where title by adverse possession is claimed to an area contiguous to that described in the deed or contract, and the whole property, described and not described, was in use by the vendor as a unit, and the fact thereof was apparent by reason of the position of fences, hedges, buildings, etc., the instrument instead of operating to negative the element of privity, seems to possess, as conjoined with such circumstances, an evidentiary value in support of privity, and this is most noticeable in instances in which the description used was such that it might reasonably have been supposed to include the whole property.
>
> "At the present time, making allowance for contrary rulings still apparently adhered to in a few jurisdictions, the cases, especially the later ones, run generally to the effect that in order to permit the tacking of successive adverse possessions of vendor and purchaser of an area not within the premises as described in the deed or contract but contiguous thereto, the composite fact to be established is the intended and actual transfer or delivery of possession of such area to the grantee or vendee as successor in ownership or claim."

In *Mary v. Maurer,* 339 Mich. 115, 62 N. W. 2d 455 (1954) the disputed strip was 8¼ feet by 33 feet. In 1919 Briggs sold to Moran who took possession of the strip although it was not included in his deed. In fact, it was included in the deed of the adjoining owner. In 1930 Moran placed a clothes pole and a clothes line between it and a tree, all three located on the strip, and the Morans used it for laundry purposes while they lived there. The Morans always kept the strip mowed. Moran's tenants continued to use the clothes line and mow the lawn. They also kept their dog and the dog house on the strip. When Moran sold to Mrs. Maurer in 1947 the strip was pointed out to her as part of the property. She continued the use of it, kept up the lawn and maintained control over it. Mr. Mary, who owned the adjoining lot thought the strip did not belong to him. The Supreme Court (Michigan) agreed with the trial judge that the requisites of adverse possession had been established. Mary argued that Maurer could not tack the possession of Moran. The Michigan court affirmed the earlier case of *Gregory v. Thorrez,* 277 Mich. 197, 269 N. W. 142 (1936) and held, speaking through Dethmers, J.:

> "The proofs accepted as true show that (a) defendant [Moran] and her predecessors did take possession of the strip in the belief that it was theirs and that no objections or adverse claims were voiced thereto by plaintiffs or their predecessors, thus indicating acquiescence; (b) that the line and stake were pointed out by Miss Moran and her realtor to defendant [Maurer], at the time of her purchase, indicating that the strip was included; and that during the years of occupancy by the Morans, Edward [Moran] used and treated the strip as his own, in a manner equivalent to and constituting as effective a pointing out of the boundary line in connection with his devise to his sister as it would have been had he pointed out the line at the time of conveying the lot to her; (c) that defendant and Miss Moran did take possession of the disputed strip with the rest of the premises, regarding it as conveyed to them. The

Gregory case is applicable and controlling here." *Id.* 62 N. W. 2d at 458.

In *Gregory v. Thorrez, supra,* the facts were much the same as they were in *Mary* and quite like the facts in the case at bar. There, Butzel, J., for the Michigan court, said:

"The main question for our determination is whether the appellant Thorrez may tack to his possession the adverse occupancy of his predecessors in title so as to make out the statutory period without having the disputed strip described in his deed. Numerous cases in Michigan have laid down the general rule that successive possessions may not be tacked where the disputed land is not described in the deed. *Lake Shore & M. S. R. Co. v. Sterling,* 189 Mich. 366, 155 N. W. 383; *Hanlon v. Ten Hove,* 235 Mich. 227, 209 N. W. 169, 46 A.L.R. 788; *Jeffries v. Sheehan,* 242 Mich. 167, 218 N. W. 703. These cases, however, do not consider the question of whether tacking is permitted where successive grantees over a period of 15 years had the lots first pointed out to them and possession given with the deed. Is the last grantee entitled to the ownership of the disputed strip under such circumstances, notwithstanding the fact that he has not owned it for 15 years, and it has not been described in his deed, notwithstanding that he and his predecessors have claimed ownership and possession for over 15 years and this claim has been acquiesced in by plaintiffs and their predecessors in title? The rule outside of Michigan permits such parol transfer. It is not the deed that creates the privity, but the parol transfer of possession. See *Davock v. Nealon,* 58 N. J. Law, 21, 32 A. 675. In *Belotti v. Bickhardt,* 228 N. Y. 296, 127 N. E. 239, a similar question was raised and the court held that privity could be established by parol and that successive periods could be added together where possession had been given by parol. See, also, *Wishart v. McKnight,* 178 Mass. 356, 59

N. E. 1028, 86 Am. St. Rep. 486, where the court held: 'This evidence would have warranted the jury in finding that each of the grantees transferred to his successor his possession of the strip of land in question, and that thereby the demandant was continuously kept out of possession.' *This seems to be the prevailing rule in most of the other States.* See *Hanlon v. Ten Hove,* 235 Mich. 227, 209 N. W. 169, 46 A.L.R. 792." *Id.* 269 N. W. at 143. (Emphasis supplied.)

In *Howind v. Scheben,* 233 Ky. 139, 25 S. W. 2d 57, 58 (1930) a small triangular parcel of land was in dispute. It was said there:

"The testimony shows that the fence now maintained has been there for more than 15 years, and that it replaced a rail fence maintained on substantially the same location for forty years. The transfer of possession of a strip of land occupied by the grantor, although without title, which is inclosed with and used as part of the land described in the deed, is not affected by its omission from the description in the deed. In such cases the possession of the grantor and that of the grantee is continuous, and there is such privity of contract between them that the period of possession by each must be added in ascertaining the total period of adverse possession. *Wishart v. McKnight,* 178 Mass. 356, 59 N. E. 1028, 86 Am. St. Rep. 486; *H. B. Jones Coal Co. v. Mays,* 225 Ky. 365, 8 S.W. (2d) 626; 2 C.J. p. 82, § 66."

Although *Sachs, supra,* was cited in the brief of one of the parties in a recent New Hampshire decision, *Alukonis v. Kashulines,* 96 N. H. 107, 108-109, 70 A. 2d 202 (1950), it was not mentioned in the court's opinion, an excerpt from which follows:

"However, the defendants claim that the plaintiff may not tack the possession of her predecessors because the deeds in her chain of title do not include the strip in question, and cite authority in support of this propo-

sition. It is significant that among the authorities cited, including both *Hanlon v. Ten Hove,* 235 Mich. 227, 209 N. W. 169, 46 A.L.R. 792, 793, and 1 Am. Jur. *Adverse Possession,* § 156, it is stated that the rule forbidding tacking under these circumstances is 'very sharply limited' to cases where only the deed is relied on 'and there is no circumstances showing an intent to transfer any property beyond the calls of the deed.' 1 Am. Jur., *supra.* In the case before us there was evidence the plaintiff was shown the bounds, which included the two rod tract, by her predecessor in title and that this tract had been inclosed and cultivated for many years by the plaintiff and her predecessors. This appears sufficient to support the plaintiff's right to tack. *Wishart v. McKnight,* 178 Mass. 356, 59 N. E. 1028, 86 Am. St. Rep. 486; 2 C.J.S. *Adverse Possession,* § 131. See also *Hoben v. Bucklin,* 88 N. H. 73, 85, 184 A. 362, 186 A. 8, and authorities cited."

In an appeal from the Alaska District Court, *Ringstad v. Grannis,* 171 F. 2d 170, 174 (9th Cir. 1948), the Court of Appeals, in a situation almost the same as *Tamburo,* followed the rule expressed in the decisions set forth above. In the opinion by Chief Judge Denman it was said:

"It is generally held that if, in connection with the conveyance of lands, there are circumstances showing an intent to transfer to the grantee the possession of other adjacent land occupied by the grantor and not covered by the deed, there is created such a privity that the grantee is permitted to tack the period of the grantor's occupancy to his own in establishing title by adverse possession to the land not mentioned in the deed. 'Where the deed is followed by the delivery of possession of the entire inclosure, it is sufficient evidence of a transfer of possession to raise the requisite privity between the parties.' *Rich v. Naffziger,* 255 Ill. 98, 99 N. E. 341, 343."

In 3 Am. Law of Prop., § 15.10, it is said:

"In some of the cases, it is held that if the adverse possessor conveys by deed which does not include part of the land of which he had possession, though the grantee takes possession of that part as well as of the part described in the deed, the two adverse possessions of the land so omitted in the deed cannot be tacked. *By weight of authority, however, the two possessions will be tacked if it appears that the adverse possessor actually turned over possession of that part as well as of that portion of the land expressly included in his deed.*" (Emphasis supplied.)

See, also, 3 Am. Jur. 2d, *Adverse Possession,* § 64; 17 Md. L. Rev. 61 (1957).

Since the parties have stipulated that the principal issue is the adverse possession *vel non* of the hatched area, we hold that:

(a) Pitts, conjointly with his use and occupation of lots 18, 19 and 20, possessed the hatched area adversely from 1935 until 1952 when he sold lots 18, 19 and 20 to Regan and delivered to Regan the possession of those lots and the hatched area;

(b) Regan took possession of the lots and the hatched area and continued to possess it adversely until 1953 when he sold the lots to Johnson and delivered to Johnson the possession of the lots and the hatched area;

(c) Johnson took possession of the lots and the hatched area and continued (together with Irvine, his tenant) to possess it adversely until 1956 when he sold the lots to the Freeds and delivered to the Freeds the possession of the lots and the hatched area;

(d) the Freeds took possession of the lots and the hatched area and continued to possess it adversely until the present; and, that

(e) the Freeds are entitled to tack to their adverse possession of the hatched area, the possession of Johnson (and Irvine), Regan and Pitts.

An odd feature of this case is the absence of a claim by the Freeds that Pitts acquired a fee simple title to the edge of the ditch in 1935. We have already mentioned the deficiencies of

the Plat of Cloverlea. Judge Hammond, in *Tamburo, supra,* pointed out similar deficiencies in the Plat of Manhattan Beach. He said there were no metes and bounds descriptions and that no compass courses were shown for the sides of the lots. J. Revell Carr, who was a competent and conscientious surveyor, was unable to locate the true line between the Manhattan Beach lots. Cloverlea was at least as bad; very likely it was worse. The boundary between lot 18 and Cherry Stone Park had not been established on the ground in 1935 and the plat was devoid of information from which it could have been ascertained. As earlier suggested, Suitt's survey, despite his self-serving assertion of its accuracy, could have been nothing more than a graphic *post hoc* representation of the contention of the association. It is obvious that the boundaries of lot 18 could have been established only by a location survey after corner stakes had been arbitrarily placed, or by agreement with a purchaser. When, therefore, Pitts entered into the possession of the land up to the line pointed out to him by Emanuel Collison, that line became the boundary between lot 18 and Cherry Stone Park. 12 Am. Jur. 2d, *Boundaries,* §§ 77, 78; 11 C.J.S. *Boundaries,* § 67. Since no argument based on this theory was advanced either in the court below or in this Court we expressly avoid making a decision in respect thereof. We have ventured the comment, however, because, in the circumstances, it seems appropriate and because it may enable the association to bear with more graceful resignation the necessity for our reversal of the trial judge.

Still another odd feature is the fact that the association owns only an undivided 1/5 interest in Cherry Stone Park. The owners of the other 3/5 interest have remained aloof and neither side has tried to make them parties. The trial judge thought Freed's purchase of the remaining undivided 1/5 interest was not "indicative of a conviction of a full ownership." He also said it illustrated Freed's state of mind. The relevance of his statement is unclear. Pitts' state of mind might have been interesting but since *Tamburo, supra,* it is unimportant.

For the reasons herein stated the judgment of the trial court will be reversed.

*Judgment reversed.*
*Appellee to pay the costs.*

"B"

Plaintiffs' Exhibit II
E.M.C.

Lot 29 And ½ Of Lot 30
Surveyed For Woodworth Williams
May 30, 1959 - Job 5559

Cherry Stone Park Surveyed
Sept. 1960 - Job 6510 - Pip. Survey
On Park Replaced With Mon. 2/10/61