WILLIAM WILSON BRATTON ET AL. *v.* SARAH PAYNE WILSON HITCHENS ET AL.

[No. 1277, September Term, 1978.]

*Decided September 10, 1979.*

The cause was argued before THOMPSON, LOWE and WILNER, JJ.

*Craig P. Morton* for appellants.

*Thomas F. Comber, III,* with whom were *Constable, Alexander & Daneker* on the brief, for appellees.

THOMPSON, J., delivered the opinion of the Court.

On April 25, 1978, William Wilson Bratton, et al., appellants, filed a petition in the Circuit Court for Cecil County for a declaratory judgment against Harry L. Wilson, III and Sue Wilson Bedyk, the appellees.[1] The chancellor held that the appellees each owned an undivided 1/30th fee simple interest in the real estate in question and the appellants owned the remainder. The appellants claim they own the entire property as the holders of legal title thereto or, in the alternative, by virtue of adverse possession. In accordance with Md. Rule 1028 g the parties have reached an agreed statement of facts which are consistent with the chancellor's findings. With minor editing we adopt the parties' statement as our own.

---

[1]. Sarah Payne Wilson Hitchens was also a party defendant but it was determined that she had no interest in the property. She did not appeal.

Edward C. Wilson died May 16, 1934, owning the subject parcel of land (Wilson Woodland) located in Cecil County, Maryland. He devised to his wife, Annie Wilson, a life estate in other real property in the Town of North East (North East Property) and bequeathed $6,000 to her in lieu of her dower or legal share in his real and personal property. Upon her death, the North East Property was to go to a nephew, Harry L. Wilson, Jr. The decedent also bequeathed $4,000 to his sister, Bertha W. Bratton and $3,000 to his brother, Walter G. Wilson. The rest and residue of the estate including, but not specifically referring to, the Wilson Woodland was left to his brother, Harry L. Wilson. The will directed the executor, Harry L. Wilson (executor), to convert all of Edward Wilson's personal property into cash to pay the bequests.

The First and Final Account of the executor shows the personal property to be valued at $11,198.83, of which $10,487.83 was cash and $711 was other property. After costs and payment of the pecuniary bequest to Annie Wilson, $759.53 remained. In addition to the personal property, an inventory dated July 17, 1935, shows that the North East Property was appraised at $2,500; and that the Wilson Woodland, an unimproved tract of woodland situate centrally in Elk Neck was appraised at $750. The North East Property was distributed to Annie Wilson, but no deed was executed.

The only assets remaining in the estate were the $759.53 in cash and the Wilson Woodland, valued at $750, while there were unsatisfied bequests to Bertha Bratton of $4,000 and Walter Wilson of $3,000. The residuary beneficiary Harry L. Wilson received nothing other than his executor's commission. The Orphans' Court on May 6, 1936, passed an Order distributing the $759.53 remaining in the hands of the executor to Bertha Bratton, it appearing to the Court that Walter Wilson was indebted to the estate in an amount in excess of his 3/7 share of the $759.53. No deed was ever executed or recorded conveying the Wilson Woodland to Bertha Bratton, either by the executor or by Harry L. Wilson individually as residuary legatee.

The Wilson Woodland was listed in the tax records under

Mrs. Edward Wilson the year following Edward's death and then in the name of Edward Wilson, care of Bertha Bratton, until 1947-1948 when the tax records appear only in the name of Bertha Bratton. The testimony indicates that Bertha Bratton paid the real estate taxes from the date of Edward Wilson's death until her death in 1954. Her heirs have henceforth paid the real estate taxes.

In 1944, Harry L. Wilson, the residuary legatee, died intestate. Any interest which he may have had in the Wilson Woodland passed by the laws of intestacy, one third to Harry L. Wilson's wife, Katharine Wilson, and two thirds to the children of Harry L. Wilson or their heirs. Nine of Harry L. Wilson's ten children were alive at his death. The tenth, Harry L. Wilson, Jr., father of respondents Sue Bedyk and Harry L. Wilson, III, had died in 1937. Shortly after Harry L. Wilson's death, another of his sons, James Wilson, died intestate and without wife or descendants. Any interest James Wilson had passed to his mother, Katharine. Any interest of respondents in the Wilson Woodland was received as representatives of their father, Harry L. Wilson, Jr. Respondent Harry L. Wilson, III, was seven years old, and respondent Sue Bedyk was seventeen years old at the time of Harry L. Wilson's death.

Harry L. Wilson died intestate, and no estate file was opened in the office of the Register of Wills for Cecil County. No inheritance tax was paid with regard to any portion of any estate he may have had.

In 1946 when William Wilson Bratton, the son of Bertha Bratton, started to practice law in the office of William J. Bratton (who had been the attorney for the estate of Edward C. Wilson), William J. Bratton said to him: "I am not sure the estate of Uncle Ed was ever finally settled. I am not sure your mother got a deed for the property that she has down in Elk Neck." William J. Bratton also suggested that he get some form of deed releases from his cousins and from his Uncle Walter in favor of his mother. Appellant, William Wilson Bratton, had no knowledge that his mother did not have record fee simple title in the Wilson Woodland until William J. Bratton called it to his attention.

352

Thereafter on August 22, 1946, Walter G. Wilson, brother of Edward C. Wilson, for nominal consideration, deeded all of his interest in law and equity in the Wilson Woodland and all of his right to the pecuniary legacy bequeathed to him "together with the right to impress the land aforesaid for the payment of said Legacy," under the will of Edward C. Wilson to Bertha Bratton.

On September 6, 1947, Katharine H. Wilson (widow of Harry L. Wilson) and six of her children, for nominal consideration, did "grant and convey unto the said Bertha Wilson Bratton, her heirs and assigns, all their interest, both at law and equity, in and to the Wilson Woodland and did "further assign transfer and set over unto the said Bertha Wilson Bratton, all their right, title, claim and interest, at Law and in Equity, as Heirs-at-Law or Devisees of the late Harry L. Wilson, to the residuary devise made to the said Harry L. Wilson, in the Will of the said Edward C. Wilson."

One of the grantors of the deed, Robert C. Wilson testified: "I myself thought it was a straightening out of a line between the old Chesapeake property and the next property down and to that extent I went ahead and signed. But I certainly wouldn't have, I don't believe, signed away without some kind of further knowledge if I'd had any idea that I was signing away on some two hundred fifty acres of land. Now, this is only as my memory tells me. I can't, it's a long time ago, and all I can remember is what at that time I think I must have thought." Another grantor of the September 6, 1947, deed, Walter G. Wilson, son of Harry L. Wilson (as distinguished from Walter G. Wilson, brother of Harry L. Wilson mentioned above) stated that: "I was not aware that I was signing a deed for two hundred and fifty or sixty acres."

Robert C. Wilson, a son of Harry and Katharine, was twenty years old in 1934, at the time of Edward C. Wilson's death and resided in Cecil County. In 1939 he moved to Baltimore but he returned to Cecil County every week or two and visited all around the county. Robert C. Wilson never visited or went on the Wilson Woodland.

On April 22, 1953, two more of the children of Harry L. Wilson, who were minors at the time of the 1947 deed,

conveyed to Bertha Bratton all of their interest in the Wilson Woodland for nominal consideration. This deed contained the same language as the September 6, 1947, deed quoted above. All three deeds were recorded among the land records of Cecil County.

William Wilson Bratton testified that the interest of Sue Bedyk and Harry L. Wilson, III, if any, as heirs of Harry L. Wilson, Jr., the deceased son of Harry L. Wilson, were overlooked. In 1976 and 1977, William Wilson Bratton contacted them by telephone and by letter and submitted to them drafts of deeds conveying their possible interests in the Wilson Woodland to himself and his children, that is, the appellants.

Sue Bedyk and Harry L. Wilson, III, both testified that they had no knowledge of the Wilson Woodland or that it had ever been in their family or that they possibly had an interest in the property until William Wilson Bratton contacted them in December 1976, January 1977 and February 1977 and sought to have them sign a deed to the appellants to clear a cloud on the title.

William Wilson Bratton testified that his father plotted the Wilson Woodland at some time between Edward Wilson's death and Christmas 1936, and that on a number of occasions before December 1936, he, his brother and parents walked the lines of the property to determine exactly where the property lines were and to determine if anyone was encroaching on what they thought was Bertha Bratton's land. Appellant William Wilson Bratton would visit the property two or three times a year. His mother, Bertha, did not go to the property as frequently as he or his brother did. Bertha Bratton gave permission to persons to cut laurel off the Wilson Woodland. Other persons also cut laurel without permission.

William Wilson Bratton testified that before Bertha Bratton's death in 1955, people had been permitted to cut firewood on this property, and this practice was continued after her death. Correspondence was introduced showing occasional sales of small amounts of timber from 1950 forward. The Wilson Woodland was included in her Maryland probate estate, and inheritance tax was paid upon the land.

Appellant William Wilson Bratton and Francis H. Bratton, her sons, as residuary devisees, received Bertha Bratton's interest in the Wilson Woodland.

On June 4, 1959, William Wilson Bratton and Francis H. Bratton granted a sixty-foot right of way across the woodland to Penn-Mar Sand and Gravel Corporation. The deed was recorded among the land records of Cecil County. Penn-Mar cut trees and made a gravel roadway through the property which was used by trucks to remove sand and gravel from another piece of property.

In 1961, Assistant District Forester John Michel of the Maryland Department of Forest and Parks examined the woodland and submitted recommendations to William Wilson Bratton.

Various negotiations were also entered into by the Cecil County Commissioners and prospective purchasers and lessees of the Wilson Woodland with William Wilson Bratton and Francis H. Bratton concerning the use, purchase and renting of the land. No such sales or leases were ever finalized and recorded except the Penn-Mar right of way referred to above.

William Wilson Bratton acquired all of his brother's interest in the Wilson Woodland by two deeds dated December 29, 1972 and June 9, 1974, respectively, and recorded among the land records of Cecil County. All income and expenses of the Wilson Woodland after Bertha Bratton's death were credited to or paid from the account of William Wilson Bratton and Francis H. Bratton until William Wilson Bratton purchased Francis H. Bratton's interest.

In 1972 William Wilson Bratton hired APR Associates to survey the Wilson Woodland. This survey was completed in 1975. Presently, an agreement is under negotiation with York Building Products Company, Inc., for the removal of gravel from the Wilson Woodland. William Wilson Bratton also rented hunting rights on the property for the last three or four years. No one has ever resided on, fenced or farmed this land, it being mostly scrub timberland with deposits of gravel.

On December 22, 1976, and November 22, 1977, William Wilson Bratton conveyed fractional interests in the Wilson

Woodland to his three children, Susan P. Bratton, Kathleen W. Bratton and William W. Bratton, Jr., for estate planning purposes. These deeds were recorded among the land records of Cecil County.

The chancellor first ruled that the appellants had failed to establish their paper title. With this ruling we are in agreement. The legal interest, if any, of the appellees was not conveyed to the appellants by deed or by court proceedings. The appellants argue that under former *Md. Code,* Art. 24, § 40, later codified as Md. Est. and Trusts Code Ann. § 9-103, the Wilson Woodland, being a residuary devise, was chargeable with the unpaid balance of Bertha Bratton's pecuniary legacy. Be that as it may, the appellants are not claiming a charge on the property but the property itself. We agree with the chancellor that legal title, insofar as the proposition is relevant to this dispute, can pass only by virtue of legal proceedings or a deed. *DiTommasi v. DiTommasi,* 27 Md. App. 241, 248, 340 A.2d 341 (1975); Md. Real Prop. Code Ann. § 5-103. We agree with appellants, however, that the chancellor applied incorrect legal principles in determining the question of adverse possession.

The elements of adverse possession are that the possession must be actual, hostile, open, notorious, exclusive, continuous, and under claim of title or ownership for a period of twenty years. *East Washington Ry. Co. v. Brooke,* 244 Md. 287, 223 A.2d 599 (1966). The chancellor stated in his opinion that the adverse possession in this case had to be established from April 26, 1958; that is, 20 years prior to the filing of the suit. We know of no authority for that proposition and the court provided none. On the contrary, the cases indicate that the period of adverse possession begins to run when all the elements coalesce. *See Phillips v. Insley,* 113 Md. 341, 77 A. 850 (1910) and *Campbell v. Fletcher,* 37 Md. 430 (1873). In the latter case the Court specifically pointed out that in order to maintain an action for ejectment an adverse possessor need not have been in the actual occupancy or possession of the property within 20 years before the institution of the suit. It is sufficient if the necessary elements coexisted for any 20

year period. In addition, as stated in *Gore v. Hall,* 206 Md. 485, 491, 112 A.2d 675 (1955):

> "[W]here there is privity of estate between the successive parties in possession, the possession of such parties may be tacked so as to make the twenty years required by the Statute of Limitations. The law is clear that such privity may be created by a sale and conveyance and possession under it as well as by descent. *Hanson v. Johnson,* 62 Md. 25, 31, 32; 2 *Alexander's British Statutes, Coe's Ed.,* 612, 613."

In the present case the elements of adverse possession commenced at least as early as 1938, as found by the chancellor, through the claim of Bertha Bratton, appellants' predecessor, and continued to the present time.

The chancellor made perhaps an even more serious error in applying the principles of adverse possession as between cotenants to the evidence adduced at trial. It is true that the law presumes that possession by one cotenant is possession by the other and, therefore, in order to establish adverse possession by one cotenant against another it is necessary to rebut this presumption by proving an actual ouster. "And while the ouster need not have been accompanied by positive force, it must have been actual, and be established by acts or declarations brought home to the knowledge of the cotenant." *Ross v. Phillips,* 148 Md. 165, 167, 129 A. 21 (1925). In the present case, however, appellants' predecessor, Bertha Bratton, entered on the land not as a cotenant or as a coparcener but under a claim of sole ownership. It was not until 1946 that she could have become a cotenant with the descendants of Harry Wilson (including appellees herein) by virtue of the quitclaim deeds. Thus, the adverse possession which was found to have commenced prior to that year, was begun adversely to all the world, the present appellees included, and the subsequent quitclaim deeds did not bring into operation the rule just discussed.

Where occupation of the property commenced adversely under a claim of sole ownership, the adverse nature of the possession is not inconsistent with the act of obtaining

quitclaim deeds from less than all of the legal title holders. As stated in Annot., 82 A.L.R. 2d 5, 172:

> "Ordinarily, if the possessor took sole possession of the premises as exclusive owner prior to the time when the cotenancy arose, his continued sole possession under a claim of exclusive ownership after the cotenancy arose is adverse to his cotenants."

This rule is sound because an adverse claimant seeking or securing a quitclaim deed is usually simply trying to avoid possible litigation. Annot., 125 A.L.R. 825.

We disagree with appellees' argument that they were entitled to claim the benefits of disability due to their minority during part of the period of possession. *Gump v. Sibley,* 79 Md. 165, 28 A. 977 (1894) stated the well-established rule that when a statute of limitations relative to adverse possession has begun to run against a party, "it is not suspended by his death, nor by the supervention of infancy, coverture or other disability; but it has become a bar against all persons claiming under him." 79 Md. at 169. *Compare Wickes v. Wickes,* 98 Md. 307, 56 A. 1017 (1904) in which the period of limitations was extended because the true owner was a minor at the time the adverse possessors took possession. In this case, Harry L. Wilson, the grandfather of the two appellees, was under no disability at the time the appellants' ancestor made claim to the property. The period of limitations was not extended because thereafter the appellees as infants inherited an interest in the property.

Finally, the chancellor erred in failing to consider the character and locality and the ordinary uses and purposes of the particular property in question. We refer particularly to a line of cases in Maryland beginning with *Sadtler v. Peabody Heights Co.,* 66 Md. 1, 10 A. 599 (1886) in which the Court said:

> "In determining the question, whether one has an actual possession of property, we must take into consideration its character and locality, and the uses and purposes for which it is naturally adapted, for

the possessory acts over an outlying and uncultivated piece of land, may be proved by acts of ownership somewhat different from what will be required in regard to land under enclosure and in actual cultivation.

    \* \* \*

"Besides all this, they have regularly paid the taxes on the property in dispute from the time of taking possession of it, 1861, to the present time. *Now the mere payment of taxes may not in itself be sufficient to prove an adverse possession, but when taken in connection with the open and public acts of ownership exercised over the property by the appellants, it is a pregnant fact to be considered in determining the adversary possession of the appellants." Id.* at 5, 7. (Emphasis added.)

In applying these principles we must be careful to note that cutting of timber and payment of taxes are not sufficient in themselves to prove adverse possession. *Goen v. Sansbury,* 219 Md. 289, 149 A.2d 17 (1959). Both cutting of timber and payment of taxes are nonetheless potent facts to support adverse possession.

We think the modern view of adverse possession was well summarized by Judge Stedman Prescott in *Blickenstaff v. Bromley,* 243 Md. 164, 220 A.2d 558 (1966), in which the Court said:

"*Actual, Open and Notorious, and Exclusive Possession.*

"We think we may conveniently consider these factors together. Formerly, in Maryland, an actual enclosure was necessary in order to sustain a claim of adverse user, *Thistle v. Frostburg Coal Co.,* 10 Md. 129, *Lurman v. Hubner,* 75 Md. 268, but since the passage of what is now Code (1957), Article 75, § 33, this is no longer a prerequisite.

"There is a well-recognized principle relative to the actual possession in adverse-possession cases to the

effect that the character, location, and use of lands vary, and the type of possessory acts necessary to constitute actual possession in one case may not be essential in another. This Court has consistently given effect to the principle. Judge Hammond, for the Court in *Goen v. Sansbury, supra,* said:

'It is true that in determining whether there has been actual possession of property, there must be considered its character and locality, and the uses and purposes for which it is naturally adapted, since possessory acts of an outlying and uncultivated piece of land may be proved by acts of ownership somewhat different from those required with regard to land under enclosure and actual cultivation.'

"See also *Bloodsworth v. Murray,* 138 Md. 631, 645, and *Gunby v. Quinn,* 156 Md. 123, 130, both involving swampland, and *Hub Bel Air, Inc. v. Hirsch,* 203 Md. 637.

* * *

"After considering the character of the land and the attendant circumstances of the case, we think the possessory acts of dominion on the land by the Blickenstaffs, their licensees, and their predecessors in title were sufficiently pronounced and continuous in nature to charge the owners of the Bromley property with notice that an adverse claim to the property was being asserted."

* * *

"We, therefore, hold that the possession of the Blickenstaffs and their predecessors was *actual.*

"Little need be added to show that the possession was 'open and notorious.' In *Bishop v. Stackus, supra,* this Court stated that, in general, it may be said that those acts which go to make possession *actual,* likewise suffice to make it *visible* and *notorious.* In the instant case, the testimony is undisputed that the entire community, for a period

far exceeding 20 years, considered the corner to be owned by the Blickenstaffs and their predecessors. Even Mr. Hoffman, whose family at one time owned the Bromley property, testified that he believed the Blickenstaffs' predecessor owned the parcel. We think and therefore hold that the possession was open, visible and notorious, and under claim of title.

"This brings us to a consideration as to whether the possession was 'exclusive.' In 3 Am. Jur., 2d, § 50 *Adverse Possession,* it is stated:

'In order to ripen into title, adverse possession must be exclusive, that is the claimant must hold possession of the land for himself, as his own, and not for another. * * *. Indeed "exclusive possession" simply means that the disseisor must show an exclusive dominion over the land and an appropriation of it to his own use and benefit. An adverse claimant's possession need not be absolutely exclusive, however; it need only be a type of possession which would characterize an owner's use.'

"We find this statement to be supported by the cases cited, and it is consistent with the previous holdings of this Court. *Blanch v. Collison,* 174 Md. 427; *Bishop v. Stackus, supra.* Compare *Wanex v. Hurst,* 188 Md. 520; *Gittings v. Moale,* 21 Md. 135; *Thistle v. Frostburg Coal Co.,* 10 Md. 129.

\* \* \*

"*Hostility of the Possession.*

"Judge Horney, for the Court, quite recently stated the meaning of 'hostility' in adverse possession cases in this manner: 'The "hostility" essential to acquisition of title by adverse possession does not necessarily import enmity or ill will, but rather that the claimant's possession be unaccompanied by any recognition, express or inferable from the circumstances, of the real owner's right to the land.' *Hungerford v. Hungerford,* 234

Md. 338, 340. See also *Clayton v. Jensen,* 240 Md. 337." 243 Md. 170-74.

What is continuous also depends greatly upon the type of premises. *Freed v. Cloverlea Associations,* 246 Md. 288, 228 A.2d 421 (1967). Uninterrupted possession does not require actual occupancy where the property does not lend itself to such use. *United States v. Fullard-Leo,* 331 U.S. 256, 67 S. Ct. 1287, 91 L. Ed. 2d 1474 (1947).

We think the appellants in the agreed statement of facts and in the chancellor's findings of facts established that they and their predecessors were in actual, hostile, open, notorious, exclusive, continuous possession of the disputed property under a claim of right for a period of twenty years.

> *Decree reversed.*
> *Appellees to pay the costs.*